**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION**

---

**MICHELE POLAND**,
*on behalf of herself and others similarly situated*,

     Plaintiff,

vs.                                                                Case No. 3:21-cv-00165-jdp

**SPRINGS WINDOW FASHIONS, LLC**,                 FLSA Collective Action

     Defendant.

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT AS TO OPT-IN PLAINTIFF SUSAN MILLER'S CLAIM**

---

Noah A. Finkel
Christina Jaremus
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
(312) 460-5000
nfinkel@seyfarth.com
cjaremus@seyfarth.com
*Attorneys for Defendant*

Defendant Springs Window Fashions ("Springs" or "Defendant"), pursuant to Fed. R. Civ. P. 56 and the Attachments to the Pretrial Conference Order in Cases assigned to Chief United States District Judge James D. Peterson, submits the following memorandum of law in support of its motion for summary judgment as to opt-in Plaintiff Susan Miller's claim.

## INTRODUCTION

Springs employed opt-in Plaintiff Miller from December 13, 1999 until June 11, 2020. During the time period relevant to this case, Springs employed Miller as a Senior Field Sales Representative ("FSR").  Springs classified Miller as exempt from the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. pursuant to the administrative and outside sales exemptions.  Miller opted-in to this collective action on August 27, 2020.  This action was originally brought by named Plaintiff Michelle Poland on July 8, 2020, who claims that Springs should not have classified her and other FSRs like Miller as exempt from overtime pay requirements and that, therefore, they are owed back overtime pay and liquidated damages for all hours worked in excess of 40 in a week.  The merits of Miller's claim turn on whether her primary job duty meets the tests for the outside sales and/or administrative exemptions.  As explained herein, the undisputed material facts in this case confirm that Miller's primary job duty falls squarely within the requirements of the exemptions.

First, Miller's primary job duty meets the outside sales exemption.  Miller was customarily and regularly engaged away from Springs' corporate headquarters.  She worked in the field, visiting clients at their places of business or from her home.  Her primary job duty consisted of engaging in persuasive activities designed to maximize sales of Springs' products.  Miller made sales directly to end-customers and trained and coached her retail or franchise clients on how to make sales directly to end-customers.  Second, and alternatively, Miller's primary job duty meets the administrative exemption.  Miller engaged in non-manual marketing work to promote sales.

2

Miller's work included the exercise of discretion and independent judgment about matters of significance when, among other things, she: conducted formal and informal, *ad hoc* product knowledge and sales training with sales associates and franchise owners, tailored to their skill level, tenure, and experience; demonstrated for and assisted store associates in making sales directly to end-customers, considering their unique budgetary and window treatment needs; and otherwise used a variety of techniques to build relationships and brand loyalty with the specific retail and franchise clients within her sales territory.  The Court should grant summary judgment in Springs' favor and dismiss her claim with prejudice.

## I.      MILLER'S FLSA CLAIM FAILS AS A MATTER OF LAW

Employees "employed in a bona fide executive, administrative, or professional capacity…or in the capacity of outside salesman" are exempt from the FLSA's overtime requirement.  29 U.S.C. § 213(a)(1).

The United States Department of Labor ("DOL") has promulgated regulations defining the administrative and outside sales exemptions.  *See* 29 C.F.R. §§ 541.200 and 541.201 *et. seq.;* 29 C.F.R. §§ 541.500 and 541.501 *et. seq.*  Miller is an exempt outside sales employee if: (1) her "primary duty is…making sales within the meaning of [29 U.S.C. § 203(k)];" and (2) "is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500(a).  Miller is an exempt administrative employee if: (1) she is paid on a salary basis; (2) her primary duty consists of the performance of office or non-manual work directly related to Springs' management policies or general business operations of Springs or its customers; and (3) her work includes the exercise of discretion and independent judgment over matters of significance.  *Id.*  As a matter of law, all of the prongs of both of these tests have been met in this case.  As the Supreme Court has explained, FLSA exemptions must be "fairly" construed, not narrowly interpreted, as some lower courts previously

had held.  *Encino Motorcars, LLC v. Navarro*, 38 S. Ct. 1134, 1142 (2018).  Courts "have no license to give the exemption anything but a fair reading." *Id*.

## II.     MILLER WAS AN EXEMPT OUTSIDE SALES EMPLOYEE

Springs correctly classified Miller as exempt under the outside sales exemption because her primary duty was making sales and she was customarily and regularly engaged away from Springs' places of business.  29 C.F.R. § 541.500(a).

### A.     Miller's Primary Job Duty Was "Making Sales" Within The Meaning Of The FLSA

The undisputed facts establish that Miller's primary job duty was engaging in sales of Springs' products directly to Springs' clients and their end-customers within the meaning of the exemption.  The regulatory definition of "making sales" under the outside sales exemption is broad.  29 C.F.R. § 541.501(b) ("'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition").  The Supreme Court has prescribed a "functional" or "realistic" definition of "making sales." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161, 167 (2012) (sales, for purposes of the outside sales exemption, is construed broadly and not limited to individuals processing purchases for customers).  In so doing, the Court made clear that the outside sales exemption applies "whenever an employee 'in some sense make[s] a sale,'" noting that the inquiry must take into account "an employee's responsibilities in the context of the particular industry in which the employee works." *Id*. at 149, 161.  Relying on the U.S. Department of Labor's position that "[e]xempt status should not depend on technicalities," *id.* at 149, the Court concluded that even a non-binding commitment to prescribe certain drugs is "tantamount" to a sale for purposes of the outside sales exemption due to "Congress' intent to define 'sale' in a broad manner." *Id*. at 163-64.

In reaching this conclusion, the Supreme Court in *Christopher* rejected the theory of liability that Miller appears to advance in this matter and determined that the outside sales exemption does not require that an employee process a transaction or have authority to bind a customer to purchase the product. *Id.* at 142, 163-64. The exemption does not depend on technicalities. *Id.* at 149; *see also Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 229-30 (2d Cir. 2018) ("The Supreme Court . . . cautioned against the use of technicalities to defeat the application of the outside salesman exemption. . . ."). Rather, the analysis turns upon whether the employees obtain some commitment from customers to purchase the product they are selling. *Flood*, 904 F.3d at 231 ("it is [the] commitment [to buy] that suffices to constitute the making of a sale for purposes of the outside salesman exemption").

Here, the purpose of Miller's job, as described in her own deposition testimony, was to obtain commitments from her sales associate and franchise owner clients to sell Springs products to end-customers as well as directly from end-consumers to buy Springs' products. (Proposed Findings of Facts ("Facts"), ¶¶ 22-24, 26, 75, 77). Miller admitted that it was up to her to drive sales in her territory. (*Id*. ¶ 23).

She testified that her most important duties included: developing key relationships with sales associates and Budget Blinds franchisees to generate sales revenue of Springs products; training her clients to improve persuasion skills and selling ability; and consulting with her clients on product positioning and maximizing Springs' brand awareness. (*Id*. ¶ 24). She regularly met with franchise owners or retail associates to analyze sales data to: suggest products that they could promote with end-customers, go over existing promotions, discuss available incentives (with Budget Blinds franchises), and offer training on product features and sales techniques to increase sales. (*Id*. ¶¶ 13, 14, 69, 76).

Miller's undisputed testimony and statements in her contemporaneous CRM entries reflect that she regularly spoke directly with end-customers with the purpose of persuading them to purchase specific Springs products. (*Id*. ¶¶ 75, 77). Miller's CRM entries show that she regularly helped customers choose Springs products for purchase. (*Id*. ¶ 75).

There is no dispute that the vast majority of Miller's time was spent attempting to drive sales of Springs products, whether she did that through training her clients on the benefits and unique features of Springs' products and selling techniques while leveraging demonstrative exhibits such as sample books and literature to aide in their training presentations, strategizing with her clients on how to increase sales using sales data, and/or directly convincing end-customers themselves to purchase Springs products. (*Id*. ¶¶ 14, 21-24, 26, 30, 75-77).

The post-*Christopher* case that bears most directly on the application of the outside sales exemption to the work Miller performs is the First Circuit's decision that employees working as "brand representatives," who performed in-store demonstrations (*i.e*., feel how soft the pillow is) and provided free samples to end-customers (*i.e.*, taste this product) at retail stores were "making sales" within meaning of FLSA's outside sales exemption from overtime wage requirements. *Modeski v. Summit Retail Sols., Inc*., 27 F.4th 53, 55-56 (1st Cir. 2022). Akin to Miller, the brand representatives in *Modeski* routinely marketed products directly to customers using various demonstrative aides and supporting materials, attempting to convince them to make a purchase. *Id*. The brand representatives, like Miller, also received incentive payments to reward their sales efforts. *Id*. Indeed, when Miller is successful in driving sales with her clients, she can earn sales bonuses in addition to her base salary on a quarterly basis and it is undisputed that she has received a sales bonuses several times per year during her employment. (Facts ¶¶ 7-8). The mere fact that cashiers performed the nonpersuasive and ministerial act of accepting payment instead of brand

representatives did not mean that the brand representatives were not engaged in sales. *Modeski*, 27 F.4th at 57-58 ("Although they do not ring up any purchase at the register, Brand Reps do as much as practically possible to 'in some sense make[ ] a sale' in the retail store context in which they operate.") The Court also did not take issue with the fact that a brand representatives, similar to Miller, "might not be personally responsible for every sale of a displayed item." *Id.* at 55.

Despite Miller's contentions that she was not a salesperson, under the Supreme Court's holding in *Christopher* and the First Circuit's holding in *Modeski*, Miller made every effort to obtain the maximum sales commitment in her day-to-day work as an FSR for Springs. (Facts ¶¶ 24-25, 77). As described above, Miller's job was to obtain commitments from her sales associate and franchise owner clients to sell Springs products to end-customers as well as directly from end-consumers to buy Springs' products. (*Id.* ¶¶ 22-24, 26, 75, 77). She testified that her most important duties as an FSR included generating sales revenue through the sales of Springs' products. (*Id.* ¶¶ 24-25, 77). She described herself as an "energetic and goal focused sales professional with a proven ability to penetrate markets, identify and capture business" and tied this description to her experience working for Springs. (*Id.*) She admitted that all of her work -- whether selling directly to end-customers, training sales associates, or consulting Budget Blinds franchisees -- was for the purpose of increasing sales of Springs products. (*Id.*). *Modeski* thus favors a finding that Miller is an exempt outside sales person.

The Second Circuit's decision in *Flood*, which affirmed summary judgment for the employer on the outside sales exemption is also on point. 904 F.3d at 231. There, the Court found that a plaintiff who sold energy plans door-to-door was making sales through his pitches to customers. *Id.* (Plaintiff was engaged in sales because he "dealt directly with the party—face-to-face with the customer at the door—who would actually purchase [the employer's] product.").

Similarly here, Miller's principal duty is to engage in persuasive activities to sell products directly to end retail and franchise customers and indirectly by convincing sales associates to sell Springs' brands to end retail and franchise customers by extoling its virtues and overcoming objections. (Facts ¶¶ 12-14, 21-24, 26, 30, 65-67, 75, 77).  Miller's persuasive activity directly and indirectly to end-customers is at the core of what it means to be "making sales."

Further, in reaching its decision the *Modeski* Court considered whether the brand representatives exhibited "external indicia of salespeople." *Modeski*, 27 F.4th at 55.  The factors that the Court considered, which likewise apply here to Miller, were whether the employee: was hired for their sales experience; was trained "to close each sales call by obtaining the maximum commitment possible"; worked away from the employer's main office, with minimal supervision; and was rewarded for their efforts with incentive compensation. *Id*. at 61.

Here, it is undisputed that Miller was hired for her sales experience, worked independently on a day-to-day basis with minimal supervision away from Springs' main office in Wisconsin, worked to obtain "the maximum commitment possible" from her clients and-end customers, and was rewarded for her efforts with sales bonuses when she hit her goals.  (Facts ¶¶ 7-8, 12, 15-20, 24-25, 77, 93-95).  First, Springs expected FSRs to have retail sales experience when applying for the role, and Miller did, in fact, have relevant sales experience.  (*Id*. ¶¶ 15-20).  Miller highlighted her extensive sales experience in her resume and cover letter that she prepared when she applied for the FSR position in 1999.  (*Id*. ¶¶ 15-19).  She admitted that she wrote this because it "described her background that was similar to what Springs was looking for."  (*Id*.).  Second, Miller performed her job with minimal supervision.  She said so herself on her resume when she discussed her experiences working for Springs.  (*Id*. ¶ 25 ("I am an energetic and goal focused sales professional with proven ability to penetrate markets…without supervision.")).  From 2017 through her

resignation in 2020 it is undisputed that she rarely met with her supervisor in-person to receive substantive feedback on her performance or day-to-day job duties. (*Id*. ¶ 93). Indeed, it is undisputed that her supervisor was not a micro-manager and that he only intervened with FSR's day-to-day duties when FSRs exhibited performance issues. (*Id*. ¶¶ 94-95). Donald Kelley, her supervisor, testified that Miller was "one of the best FSRs at selling" and that she "working with end consumers on a daily basis." (*Id*. ¶ 96). Third, there is also no dispute that Miller did not have an office at Springs' headquarters located in Middleton, Wisconsin. (*Id*. ¶ 12). She drove to and worked at her clients' places of business or worked from home. (*Id*.). Fourth, it is undisputed that Miller received incentive compensation in the form of sales bonuses when she achieved certain sales goals. (*Id*. ¶¶ 7-8). Above all, and as explained above, Miller made every effort to obtain the maximum sales commitment in her day-to-day work as an FSR for Springs. (*Id*. ¶¶ 24-25, 77). Thus, as a matter of law, Miller's primary job duty is making sales within the meaning of the outside sales exemption.

### B. Miller Was Engaged Away From Springs' Place Of Business In Performing Her Primary Job Duty

The FLSA mandates that exempt outside sales employees are customarily and regularly engaged away from the employer's place or places of business in performing their primary job duty. 29 C.F.R. § 541.500(a). It is undisputed that Miller did not have an office at Springs' headquarters located in Middleton, Wisconsin. (*Id*. ¶ 12). She drove to and worked at her clients' places of business or worked from home. (*Id*.). Thus, as a matter of law, Miller was customarily and regularly engaged away from Springs' place in performing her primary job duty.

### III. MILLER WAS AN EXEMPT ADMINISTRATIVE EMPLOYEE

Alternatively, if the Court finds that Miller's primary duty was not making sales within the meaning of the FLSA's outside sales exemption Miller, then her primary duty was sales promotion

and marketing work under the administrative exemption.  The administrative exemption applies to any employee whose work is directly related to assisting with the running or *servicing* of a business, including marketing representatives, so long as their work includes discretion and independent judgment as to significant matters.  Indeed, the U.S. Court of Appeals for the Seventh Circuit has considered nine cases under the administrative exemption and upheld application of the that exemption in eight of them,[1] signaling that the exemption turns on a broad analysis of whether the employee performs work ancillary to the employer's primary output, and if so, whether the work includes discretion and independent judgment as to matters of significance.

The undisputed evidence shows that Miller was paid on a salary basis, her primary job duty constituted non-manual marketing work, ancillary to Springs' primary output of generating window fashions, and that she exercised discretion and independent judgment as to matters of significance, thus warranting the application of the administrative exemption.

### A.    Miller Was Paid On A Salary Basis Of At Least $684 Per Week

The FLSA requires that administrative exempt employees be paid on a "salary basis," meaning they regularly receive a predetermined amount of compensation which is not subject to reduction due to variations in the quality or quantity of work performed, 29 C.F.R. §§ 541.602 and 541.212, and which is at least $684 per week.  *Id.* at § 541.600.  Miller admits that she always understood during her employment that she would receive the same annual salary regardless of the number of hours she worked.  (Facts ¶¶ 2-3).  She also admits that, during the relevant time period,

---

[1] *Blanchar v. Standard Ins. Co.*, 736 F.3d 753 (7th Cir. 2013); *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560 (7th Cir. 2012); *Verkuilen v. MediaBank, LLC*, 646 F.3d 979 (7th Cir. 2011); *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365 (7th Cir. 2005); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527 (7th Cir. 1999); *Shaw v. Prentice Hall Computer Pub., Inc.*, 151 F.3d 640 (7th Cir. 1998); *Haywood v. North Am. Van Lines, Inc.*, 121 F.3d 1066 (7th Cir. 1997); *contra Bigger v. Facebook, Inc.*, 947 F.3d 1043 (7th Cir. 2020).

her base weekly salary was at least $1,189.87 (her 2017 salary ($61,873.32 divided by 52 weeks). (*Id*. ¶ 5).  Thus, as a matter of law, Springs paid Miller on a salary basis.

**B.      Miller's Primary Job Duty Was To Perform Work Directly Related To The Management Or Business Operations Of Springs**

The undisputed facts establish that Miller's primary job duty was "relate[d] to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment 'sales' work."  29 C.F.R. § 541.205(a).  Administrative duties include, "but are not limited to work in such functional areas such as … advertising; marketing … ."  29 C.F.R. § 541.205(b).

Here, as a matter of law, if Miller's work was not sales itself, Miller's job duties promoting the sales of Springs' products were administrative in nature.  Miller was not engaged in the production of the window fashions that Springs offers to its clients.  Miller's work promoting sales, or marketing, is indisputably an administrative function.  *See e.g.*, *See e.g., Schaefer-LaRose, v. Eli Lilly & Co.,* 679 F.3d 560 (7th Cir. 2012) (pharmaceutical representatives deemed exempt); *Reich v. John Alden Life Ins. Co*., 126 F.3d 1, 10 (1st Cir. 1997) (marketing representatives held as exempt).  Miller's job as an FSR was to attain short-and-long range retail sales growth at her retail and Budget Blinds clients through training, selling, influencing, and building relationships with the retail store associates and franchise owners on the brands Springs sells, selling points, selling methods and techniques, merchandising, ordering procedures, upcoming promotions, and customer service.  (Facts ¶¶ 13, 14; *see also id*. ¶¶ 21-49, 67-77).

**C.      Miller's Work Included The Exercise Of Discretion And Independent Judgment**

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202.  Nothing in the DOL regulations

11

requires that administrative exempt employees spend most of their time exercising discretion or independent judgment; rather, "[t]o qualify for the administrative exemption, an employee's primary duty must *include* the exercise of discretion and independent judgment with respect to matters of significance." *Id.* (emphasis added).

The undisputed facts in this case confirm that Miller's primary job duties included significant discretion and independent judgment. Indeed, Miller's discretion and independent judgment showed through in how she engaged in informal, *ad hoc* training and formal training; how she interacts with different employees at different clients; how she teaches her clients how to sell, including demonstrating how to sell with actual end-customers; and how she advocated for a product-specific display to be retained in her territory, even though it was phased out in Springs' other territories.

In *Schaefer-LaRose,* the Seventh Circuit found that pharmaceutical "sales representatives" were exempt from overtime under the administrative exemption. 679 F.3d at 583. The primary their of the sales representatives was to call upon physicians and to persuade them to prescribe the pharmaceutical products of the representative's employer. *Id.* at 562. When meeting with physicians, their goal was a chain of events: to increase the number of prescriptions that those physicians wrote for their employer's products, which in turn resulted in an increase in the number of prescriptions filled by end-customers as well as an increase in the overall demand for the drug. *Id.* at 563.

The Seventh Circuit found that the sales representatives' spent the majority of their time preparing for, making, and documenting sales visits "with the consistent goal of obtaining meaningful access to the physicians and of influencing their preference for the company's products." *Id.* The Court noted that they used their discretion and independent judgment when

they developed pre-call plans that varied widely based on the physician's particular prescribing practices, patient population, and similar information from data provided by the pharmaceutical company or notes taken by the representative himself when developing a strategy to engage the physician in a conversation about the product, including appropriate visual aids or literature to pique the physician's interest.  *Id*. at 563-64.

### 1. Miller Used Discretion and Independent Judgment When She Customizes Her Client's Training Plans

Akin to the employees in *Schaefer-LaRose*, Miller grew sales by formally and informally training store associates and franchise owners to be confident and effective sellers of Springs products and services to increase purchases by end-customers.  (Facts ¶¶ 22-24; 26-42).  Miller most frequently conducted informal, one-on-one training sessions tailored to individual retail associates or Budget Blinds franchise owners or managers.  (*Id*. ¶ 36).  Miller testified that "every time [she] set foot into [a retail] store [she] tried to train and promote" Springs products.  (*Id*. ¶ 37).  She likewise trained Budget Blinds franchise owners whenever there was a new product or feature to discuss.  (*Id*. ¶ 38).

Miller used her discretion and independent judgment to tailor her sales strategy and presentations to particular sales associates and owners she was dealing with.  For example, Miller decided the type of training to engage in with each retail sales associate or franchise owner.  (*Id*. ¶¶ 39, 43-49).  She simply could not take the same training approach with every retail associate because their experience, tenure, and job duties varied.  (*Id*.).  When she encountered brand new store associate or franchise owners, she would start by getting a feel for their background and level of knowledge.  (*Id*. ¶ 39, 44-46).  If the person was new to the industry, she trained them on the basics, such as how to measure a window and arm them with knowledge about an easier to sell product, such as a faux wood blind.  (*Id*.)  She might go over the same things twice to ensure they

understood.  (*Id.*)  She would not take this approach if the client she encountered, for example, had worked for the retail or franchise client for many years and already had a strong knowledge base about relevant products and sales techniques.  (*Id.* ¶ 39, 44-45).  With those clients, she would train on sales technique and product nuisances.  (*Id.*)  She took another approach when she trained individuals in other departments.  (*Id.* ¶ 47).  With those individuals, she wanted to ensure that the sales associate was "in the loop" enough to refer end-customers to Springs products if he or she saw the opportunity.  (*Id.*).

Miller used her discretion and independent judgment to decide what materials to use during training.  When she conducted formal training classes, she loosely referenced PowerPoint materials provided by Springs and leveraged sample books and blinds as visual aides to keep her presentations interesting and help her audience understand, but she was a "not a big PowerPoint user."  (*Id.* ¶¶ 27-31).  On at least one occasion, she even designed her own training materials and presentation for a class that was held at Springs' training facility located in Phoenix, Arizona.  (*Id.* ¶¶ 32-33).  Once or two per year she opted to collaborate with another FSR to conduct formal training sessions.  (*Id.* ¶ 34).

To encourage attendance of her training classes, Miller even designed custom flyers, which she personally delivered or emailed to her clients.  (*Id.* ¶ 32).  Miller also designed customer flyers to remind her clients about things like dates of sales promotions and to make sure that promotion signs were displayed on the sales floor to drive sales.  (*Id.* ¶¶ 65-66).

The fact that Miller relied on specific training materials and followed corporate initiatives to push certain products when she was training her clients informally and formally is of no moment.  In *Schaefer-LaRose*, the Court acknowledged that the sales representatives were constrained by a "core message," that had to "be delivered precisely to ensure compliance with

14

applicable laws and to represent accurately the science of a particular product." *Schaefer-LaRose*, 679 F.3d at 564.  But the Court noted "[n]evertheless, the calls do not follow a predictable course. For example, sales representatives are encouraged to employ sales techniques that tailor the company's core messages most successfully to each physician's schedule, preferences and patient population." *Id*.

This analysis is not limited to pharmaceutical sales representatives.  In *Brown v. Nexus Bus. Sols., LLC*, 29 F.4th 1315, 1318-19 (11th Cir. 2022), the Eleventh Circuit found that business development managers who worked on behalf of car dealerships to "develop business leads and opportunities for the dealerships" who could not actually finalize any sales exercised discretion and independent judgment, as required for them to fall within administrative exemption.   The employees in *Brown* argued that their work was too restricted and repetitive to allow for meaningful discretion because they claimed they asked pre-determined questions, followed "literal scripts," and used "canned presentation materials" with little to no deviation in trying to secure new corporate clients.  *Id*. at 1318.  The Court disagreed, noting that a worker need not have "limitless discretion" or a total lack of supervision to qualify as an administrative employee.  *Id*. It noted that the employees engaged in the requisite discretion and independent judgment because they "had a hand in choosing which [customer] leads to develop, performed customized research before meeting with selected leads, and delivered presentations that necessarily required some amount of customization."  *Id*.

## 2.    Miller Used Discretion and Independent Judgment When She Adapted Unique Demands Called For In Her Territory

Miller also used her discretion and independent judgment when she modified displays based on unique product-based demands in her territory.  Springs products are displayed for end-customers in retail stores so that they can see, touch, and feel real products prior to purchasing

them.  (Facts ¶¶ 51, 59).  The Company designs in-store displays in tandem with the retailers via a schematic called a Plan-o-gram.  (*Id*.).  Plan-o-grams provide directions to FSRs on both where in the store the display should be located as well as what Springs' products should be displayed and where they should be placed on the displays.  (*Id*.).  During Miller's tenure, the Company discontinued a vertical blind product, the VertiCell (an option to a traditional vertical blind), from all displays (and thus plan-o-grams) in retail stores nationwide.  (*Id*. ¶¶ 56, 57).  Unlike all of the stores in other states that Miller serviced, VertiCells sold in Miller's Phoenix, Arizona territory in unprecedented numbers.  (*Id*. ¶¶ 22-55).  Miller believed VertiCells were sought after by her Phoenix, Arizona end-customers because many of them had large windows with "beautiful vista views."  (*Id*. ¶ 54).  She used her discretion and independent judgment to avoid a decrease in her VertiCell sales when she (successfully) petitioned Springs to retain the Verticell displays only in her Phoenix, Arizona territory.  (*Id*. ¶¶ 57-59).  Miller testified that she successfully petitioned Springs to retain similar vertical products several other times during her tenure at Springs to service the unique sale demands of her Arizona end-customers.  (*Id*. ¶ 60).

Miller also had to use her discretion and independent judgment when she adapted to new territories that she was assigned to during her employment, which included Memphis, Tennessee, Phoenix, Arizona, and Atlanta, Georgia.  (*Id*. ¶¶ 83-90).  There was always transition time when Miller was assigned to a new territory.  (*Id*. ¶ 89).  Miller testified that reacquainting herself with the Phoenix, Arizona territory (which Miller serviced earlier in her career and then was reassigned to later) was challenging because it was geographically vast, there were more end-customers, more store associates to train, and generally, more business.  (*Id*. ¶¶ 84-87).  Nevertheless, Miller's manager praised her for anticipating customer needs and providing services that were "beyond customer expectations."  (*Id*. ¶ 88).

Miller also used her discretion and independent judgment when she modified other displays outside of plan-o-gram directions from time-to-time.  (*Id*. ¶ 61).  Specifically, when products were not delivered in a timely fashion, Miller decided that vacant space on her displays might hinder her sales.  (*Id*. ¶¶ 62-64).  When that happened, Miller used her judgment and experience to pick a product that she thought went with the overall theme of the display and put it in the vacant space. (*Id*.)

> ### 3.    Miller Used Discretion and Independent Judgment When She Assisted Her Clients In Selling Springs Products And Analyzed Sales Data and Client Feedback To Maximize Sales Of Springs Products

Miller also assisted her clients in making sales and analyzed sales data to maximized sales of Springs products.  Miller's sworn testimony and CRM entries reflect that she routinely used her discretion and independent judgment when she made or assisted store associates in persuading end-customers to buy Springs' brands based on their unique needs.  (*Id*. ¶¶ 67-75).  While on one day she assisted an end-customer "with top treatments" and who needed an installation "to be done correctly on roller shades," on another day she worked with a "customer on sliding panel, wood vertical & natural drape" for their new home.  (*Id*. ¶ 75).  On yet another day she "s[old] wove wood shades" that resulted in a thousand dollar sale, on a different day she hosted a selling event at Lowe's and sold "1 natural shade & one motor cell shade," and on a different day she assisted a store associate with a "BE [Bali Essentials] order" and sold 7 blinds."  (*Id*.)

Miller also used her discretion and independent judgment when she analyzed sales data and took in customer feedback to develop a client-specific sales plan to drive sales and brand loyalty.  For example, her CRM entries reflect that she worked with a sales associate to analyze the store's market and popular trends and chose the best products to display which met market preferences that the store associate could use as a selling tool at the Home Depot.  (*Id*. ¶ 76).  With

a Budget Blinds franchisee, she noted the franchisee's preference to grow shutters/composite and discussed how the owner could earn an incentive trip by hitting certain sales targets.  (*Id*.)  With another Budget Blinds franchisee, she received feedback that he was not interested in selling Springs' cellular products unless it had fabrics with color on both sides and sought to overcome this feedback by getting him to agree to meet with her again when she had relevant samples to show him.  (*Id*.).  With yet another Budget Blinds franchisee, she showed him cellular products, which he committed to purchase and sell in his franchise and discussed his overall sales, especially shutters.  (*Id*.)  On other occasions she met with retail sales associates to train them on ways to sell core products to end-customers as a "bridge" or introduction to custom products, how to emphasize the value of Springs products when selling to budget-minded customers, and how to sell Springs custom products against stock products.  (*Id*.)  Miller thus routinely exercised discretion and independent judgment when she analyzed sales data and client feedback and developed a sales and training plan to drive sales.  (*Id*.)

### 4.    Miller Used Discretion and Independent Judgment When Building Relationships With Her Clients

In *Smith v. Johnson & Johnson*, 593 F.3d 280, 283 (3d Cir. 2010), in deciding that a pharmaceutical sales representative exercised discretion and independent judgment about matters of significance, the Third Circuit considered that the Plaintiff "had to be inventive and cultivate relationships with the doctor's staff, an endeavor in which she found that coffee and donuts were useful tools" as well as taking doctors to lunch or to sponsor seminars.  *See also Schaefer-LaRose*, 679 F.3d at 562 (the representatives were sometimes successful in meeting with physicians in their offices, but often had to find creative ways to reach difficult-to-reach physicians, such as sponsoring an educational event, taking the physician for a complimentary meal, and/or providing free product samples.)

Here, Miller similarly used her discretion and independent judgment when she found creative ways to build relationships with her retail sales associates and Budget Blinds franchise owners. She used it when she provided food to sales associates during formal training sessions and, whenever possible, when she provided sales associates with Springs-branded giveaways like pens and notepads, as well as candy to create a positive association with the brand. (Facts ¶ 35). She also used it when she created customized flyers to encourage attendance of her training classes and to remind her clients about things like dates of sales promotions and to make sure that promotion signs were displayed on the sales floor to drive sales. (*Id.* ¶¶ 32, 65-66).

### 5. Miller Used Discretion and Independent Judgment Even Though Springs' Focused Her Attention On High-Sale Stores

The Seventh Circuit found that the sales representatives in *Schaefer-LaRose* exercised discretion and independent judgment even though their employer identified the physicians they visited "as high-prescribing or low-prescribing with respect to the employer's products and assign[ed] a numerical or frequency goal regarding visits to that physician by an individual representative or by the team in a certain region" and representatives composed a work plan using this data for management approval. 679 F.3d at 567. Similarly, the Third Circuit in *Smith*, found that a pharmaceutical sales representative exercised discretion and independent judgment even though her employer gave her a list of target doctors that it created and told her to complete an average of ten visits per day, visiting every doctor on her target list at least once each quarter, noting the plaintiff's own characterization of her independence in performing her job responsibilities that she was allowed "to run the territory the way [she] wanted to," which the court characterized as an admission that she was "the manager of her own business." 593 F.3d at 282-83, 285.

19

Here too, while Miller was expected to meet a certain number of sales calls per week and Springs suggests a focus level for stores under Springs' A, B, C, D store call model based on their volume of sales, Miller remained free to deviate from the call model should certain opportunities or customer service necessities arise.  (Facts ¶¶ 78-82).  For example, Miller deviated from the call model when a particular store had a logistical issue or if geographically, it made more sense to visit certain stores on certain days, instead of others, so that she could spend her time efficiently and not needlessly commuting.  (*Id.*)

Miller was expected to do certain tasks by certain dates, but she planned her daily route when she would visit specific retail stores and Budget Blinds franchisees.  (*Id.* ¶ 80).  It is ultimately "in the FSR's discretion…[as to] how they manage their time in [each] account."  (*Id.*).  As mentioned above, Miller engaged in critical thinking and analysis to decide the specific plan she used at each store to drive sales based on the store's sales and her knowledge of that account's profile.  (*Id.* ¶ 76).

### 6.    Miller Enjoyed Autonomy In Performing Her Day-To-Day Job Duties

Miller also performed her job duties with minimal supervision and oversight.  She came to Springs with relevant sales and merchandising experience working at Executive Site Manager for DECK Office Centers, as an Account Executive and salesperson at a food broker, Crossmark, a Territory Sales Representative at both Pen-Mar and Helene Curtis, Inc.; and Corporate Sales Trainer at Georgia Federal Bank.  (*Id.* ¶¶ 16-19).  When she changed territories multiple times during her 20-year tenure with Springs, each time she hit the ground running and worked independently to acquaint herself with her new territory.  (*Id.* ¶¶ 85-88).

Miller's supervisors substantively evaluated her once per year during her annual performance review and occasionally evaluated her during "ride-alongs," during which he would

accompany her on day trips through her territory. (*Id*. ¶¶ 93). In some of the years between 2017-2020 when Miller was with Springs, however, she only met with a supervisor in person once a year and there were days where she worked completely independently, without any communication from her supervisors in any capacity. (*Id*. ¶ 20). Miller testified that she did not feel micro-managed by Kelley, who confirmed that he is not a micro-manager and that he only intervened with the day-to-day duties of an FSR if there were performance issues. (*Id*. ¶¶ 94-95). Kelley testified that Miller was "one of the best [FSRs] at selling" and "working with end consumers on a daily basis," so on a day-to-day basis, Miller worked independently, without substantive feedback on her job performance, and self-scheduled her sales route and formal training classes in her discretion and as she saw fit. (*Id*. ¶¶ 81-82, 91, 96-97). On these facts, Miller exercised discretion and independent judgment in performing her day-to-day job duties. *See Schaefer-LaRose*, 679 F.3d at 567-68 (sales representatives engaged in discretion and independent judgment because they were without direct supervision while meeting with physicians even though supervisors conducted "occasional ride-alongs," periodic check-ins, and regular conference calls, meetings and training sessions); *Smith*, 593 F.3d at 282 ("Smith's deposition she made it clear that she appreciated the freedom and responsibility that her position provided. Though a supervisor accompanied Smith during the doctor visits on a few days each quarter, by her own calculation Smith was unsupervised 95% of the time.").

### 7. Best Practices Guidelines And Retail Uniformity Measures Do Not Mean Miller Did Not Exercise Discretion and Independent Judgment

Miller likely will argue in her response that her discretion was limited by uniform training materials that Springs provided for use with her customers, checklists that she referenced when she was working with a new Budget Blinds franchise owner, best practices guidelines for specific retail clients, and Springs' CRM system. But an employee who is directed by guidelines and

manuals can still exercise discretion and independent judgment. *Renfro v. Indiana Michigan Power Co*., 497 F.3d 573, 574 (6th Cir. 2007).

Akin to the FSRs in this case, the materials that the sales representatives in *Schaefer-LaRose* relied upon regarding products that were created centrally and they had "no authority to generate anything original." *Schaefer-LaRose*, 679 F.3d at 564, 581. This did not stymie their discretion and independent judgment because the sales representatives -- akin to Miller -- selected which of their employer's materials would best be used for a specific call. *Id*. at 581 ("Indeed, although the companies gave the representatives precise wording and materials, they certainly did not treat the representatives as simple mouthpieces, reciting scripts.") Miller is not simply reading from a script either. She is conducting in-the-aisle training using her discretion to decide what training materials are best for her particular client contacts. (Facts ¶ 36). Likewise, checklists and best practices guidelines are simply reference materials to help her tailor her training and, ultimately, maximize her client relationships and sales within particular retail and franchise clients.

CRM does not dictate's Miller job duties whatsoever. CRM is used by FSRs to pre-plan their route and sales calls with commitment objectives and for post-sales call follow-up to record what was accomplished on the sales call and an action plan for any necessary follow-up. (*Id*. ¶¶ 67-73). Miller uses CRM to track the loyalty of store associates and franchise owners to Springs' brands, how much training they need, and whether or not they are highly experienced in selling custom products, to maintain customer profile information, and to track initiative and promotion execution levels. (*Id*.). Under these facts, Miller exercises discretion and independent judgment even if she is subject to guidelines and a client relations management system to ensure best practices among her retail clients. *See Renfro*, 497 F.3d at 577 (manuals which provided guidelines on procedure for technical writers to consider during their drafting process did not take away from

22

their exercise of discretion and independent judgment in executing written pieces based on their own research and analysis).

### 8.     Miller Exercised *Enough* Discretion and Independent Judgment

More fundamentally, any argument that Miller did not exercise *enough* discretion and independent judgment misses the mark.  This is because the amount of discretion and independent judgment necessary to be administrative exemption is low.  Miller's primary duty need merely "*include*" the exercise of discretion and independent judgment. 29 C.F.R. § 541.202 (emphasis added).  This stands in contrast to other areas of the FLSA and state overtime law exemptions that require a certain percentage of time on exempt work in order to be exempt.  For example, under some exemptions an employee cannot be exempt if they do not spend at least 80% of their time on work that is directly and closely related to their exempt work.  Wis. Admin. Code § DWD 274.04 (Wisconsin's white-collar exemptions); 29 C.F.R. § 552.6 (FLSA's companionship exemption).  Some require that an employee be "primarily engaged" in exempt functions, meaning they must spend more than 50% of their time on those functions.  Cal. Labor Code § 515(e) (California's white-collar exemptions).  Most of the FLSA's white-collar exemptions require that exempt work be an employee's "primary duty," for which the regulations state that an employee who spends more than 50 percent of their time on exempt work will generally satisfy the primary duty requirement, but those who do not may still have exempt work as their primary duty. 29 C.F.R. § 541.700(b). And another set of exemptions requires an employee to engage in an activity "customarily and regularly," which can be satisfied by an employee engaging in that activity for as little as one to hours per week for an hour or two at a time. 29 C.F.R. § 541.502 (FLSA's outside sales exemption requiring employee to be engaged away from the employer's place of business "customarily and regularly"); *id.* at § 541.701 (defining "customarily and regularly" as "a

frequency which must be greater than occasional but which, of course, may be less than constant”); DOL WH Op. Ltr. FLSA2007-2 (Jan. 25, 2007); *see also Hantz v. Prospect Mortgage, LLC*, 2014 U.S. Dist. LEXIS 14359 at *17 (E.D. Va. Feb. 5, 2014) (citing authority for the proposition that selling or sales-related activity outside of the office one or two hours a day, one or two times a week satisfies the test for being “customarily and regularly engaged away”); *Cougill v. Prospect Mortgage, LLC*, 2014 U.S. Dist. LEXIS 4659 at *8 (E.D. Va. Jan. 14, 2014) (same).

As low as that bar is, the bar for the frequency with which an employee must exercise discretion and independent judgment to be administrative exempt is even lower.  The employee's work need only “*include*” discretion and independent judgment.  29 C.F.R. § 541.202.  Miller's primary duty of persuading her clients to sell Springs’ products by training on product features, selling methods and techniques, merchandising, ordering procedures, upcoming promotions, and customer service for Springs’ “included” discretion and independent judgment by any definition of the word.  (Facts ¶¶ 9, 13, 22).  Miller developed a specific sales strategy for each client and decided the appropriate level of training and how to build relationships with retail employees and franchise owners to maximize sales and brand loyalty.  (*Id.* ¶¶ 22-42, 67-76).  For these reasons, Miller's primary duty included the exercise of discretion and independent judgment.

### D.    Miller's Exercise of Discretion And Independent Judgment Were About Matters of Significance

Finally, the administrative exemption requires that Miller exercise discretion and independent judgment *with respect to matters of significance*.  29 C.F.R. § 541.202.  The discretion and independent judgment Miller exercised relates to matters of significance because her work of ensuring that Springs’ clients maximized sales of its products is crucial to both Springs’ and its clients overall economic success.  (*See e.g.,* Facts ¶¶ 13, 22-25).  As Springs’ corporate representative testified, “If there was no FSR training and getting th[e] stores primed to offer

[Springs] products, our sales would not materialize like we expect…they strongly support the store associate in the whole selling process to make sure we're effectively represented and strongly preferred and the store associates are very confident selling our products." (*Id.* ¶ 22).  Thus, not only did Miller exercise discretion and independent judgment, she exercises that judgment with respect to driving Springs' sales -- a significant matter, to say the least.

## **CONCLUSION**

For the foregoing reasons, Springs respectfully requests that this Court grant its motion for summary judgment in its entirety and enter judgment in its favor on all of Miller's claims.

Dated: May 13, 2022

Respectfully submitted,

SPRINGS WINDOW FASHIONS, LLC

*s/ Christina Jaremus*
Noah A. Finkel
Christina Jaremus
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
(312) 460-5000
nfinkel@seyfarth.com
cjaremus@seyfarth.com
*Attorneys for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

I, Christina Jaremus, hereby certify that on May 13, 2022, a true copy of the foregoing document was served via the Court's CM/ECF filing system on the following Counsel for Plaintiffs:

> Gordon E. Jackson
> J. Russ Bryant
> Robert E. Turner, IV
> Robert E. Morelli, III
> JACKSON, SHIELDS, YEISER, HOLT
> OWEN & BRYANT
> 262 German Oak Drive
> Memphis, Tennessee 38018
> Telephone: (901) 754-8001
> Facsimile: (901) 754-8524
> gjackson@jsyc.com
> rbryant@jsyc.com
> rturner@jsyc.com
> rmorelli@jsyc.com
> *Attorneys for Plaintiffs*
>
> <u>*s/ Christina Jaremus*</u>