IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

---

**MICHELE POLAND**,
*on behalf of herself and others similarly situated*,

     Plaintiff,

vs.                                  Case No. 3:21-cv-00165-jdp

**SPRINGS WINDOW FASHIONS, LLC**,     FLSA Collective Action

     Defendant.

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DECERTIFY THE COLLECTIVE ACTION

---

Noah A. Finkel
Christina Jaremus
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
(312) 460-5000
nfinkel@seyfarth.com
cjaremus@seyfarth.com
*Attorneys for Defendant*

Defendant Springs Window Fashions ("Springs" or "Defendant"), pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), submits the following memorandum of law in support of its Motion to Decertify the Collective Action brought by Plaintiff Michelle Poland ("Poland").

## INTRODUCTION

This case was brought by Poland on behalf of herself and she subsequently sought conditional certification of a nationwide collective of Field Sales Representatives ("FSRs") and Senior Field Sales Representatives ("Sr. FSRs") (collectively "the Opt-Ins")[1] who were or are current employed by Springs.  Poland maintains that she and the Opt-Ins were not paid at the applicable overtime rate for all hours worked in excess of forty (40) per workweek.  On April 15, 2021, the Parties stipulated to conditional certification, recognizing that the standard in the first phase of the certification process is "fairly lenient," which the Court accepted and entered.  ECF No. 54, 56.  Following the withdrawal of consents of Territory Sales Managers, there currently are 34 Opt-Ins in the lawsuit in addition to Poland.  ECF No. 10-17, 19, 21-25, 27, 33, 38, 44, 57, 61-73, 75, 82-85.

Discovery has shown that trying the claims of Poland and Opt-Ins in one proceeding is impossible.  The relevant factual and employment circumstances of Poland and Opt-Ins vary widely, with Poland and the Opt-Ins providing divergent accounts of their job duties and responsibilities.  Among other things, some of the Opt-Ins testified that installing, maintaining, and cleaning displays was their primary job duty while others testified that their primary job duty was engaging in the sales and marketing of Springs' products directly to Springs' clients and their end-customers.  Some of the Opt-Ins testified that they frequently engaged or assisted sales

---

[1] All employees in the job title "Territory Sales Managers" withdrew their consent on May 3 and 4, 2022.  *See* ECF No. 83, 84, 85.

associates in direct end-customer selling, while others claimed they did so infrequently.  The Opt-Ins also varied significantly in the level of discretion and independent judgment they claim they exercised in training and promoting sales and marketing at their respective clients, including the manner in which they created training plans for their clients and taught them how to sell, how they built relationships with their clients, and the extent their managers exercised control over their daily work.  The Opt-Ins' particular territories also varied extensively such that the length of their pre-planning, sales calls, and travel throughout their territory makes it impossible to draw an inference of the representative working hours of all 35 Opt-Ins based on the experience of Poland and the eight Opt-Ins designated as "Representative Plaintiffs."

Given this array of differing testimony about their job duties, the claims of Poland and all Opt-Ins cannot be decided in one proceeding because there is no testimony that is representative of the claims of Poland and the Opt-Ins.  Counsel for Poland and the Opt-Ins' trial plan is also infeasible because there is no evidence as to how "representative" Opt-Ins were chosen -- whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and handpicked to magnify the damages sought by the class and/or the most Plaintiff-friendly version of the case.

Deciding the claims of Poland and the Opt-Ins requires highly individualized analysis, making trial of all of their claims in one proceeding impossible on a collective basis.  Accordingly, the Court should decertify the collective action and dismiss the Opt-Ins' claims without prejudice.

## **ARGUMENT**

## I.   **THE HIGH STANDARD FOR MAINTAINING A COLLECTIVE ACTION**

Determining whether employees are similarly situated under the FLSA is a two-step process.  *Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 604 (W.D. Wis. 2006); *see also* ECF No. 53, 56.  At the first stage, a plaintiff must obtain a conditional certification, and at the second

stage, after the parties have engaged in discovery and the opt-in process is complete, the court engages in a more stringent review of whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial as a collective action. *See Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 104 (N.D. Ill. 2013); *Passi v. Illinois Bell Tel. Co.*, No. 15 C 2794, 2016 WL 193401, at *3 (N.D. Ill. Jan. 15, 2016).

At this stage, "the district court has a much thicker record" and the "plaintiff bears a heavier burden." *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008). This second step analysis necessitates a thorough examination of "actual job characteristics and duties." *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010). To continue as a collective action, the plaintiffs must identify a "factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally." *Hundt*, 294 F.R.D. at 104 (citing *Russell v. Illinois Bell Tel. Co.*, 721 F. Supp. 2d 804, 812 (N.D. Ill. 2010)). The plaintiffs cannot establish the factual nexus by merely showing that the defendant applied an exemption to a group of employees across the board. *See id.* (citing *Russell*, 721 F. Supp. 2d at 813) (courts look to whether the plaintiffs "share a legal and factual nexus that is more specific than the general claim that they were illegally denied overtime pay") (internal quotation marks and citation omitted)); *see also Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1237 (N.D. Ala. 2012). Rather, evidence of an across-the-board exemption must also be accompanied by evidence that the affected employees were similarly situated. *Russell*, 721 F. Supp. 2d at 813.

To determine whether members of the proposed class are similarly situated, the court must consider the following three factors: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns."

4

*Hundt*, 294 F.R.D. at 104.  At bottom, the Court must decide whether the plaintiffs' job duties and pay provisions are sufficiently similar such that it is likely that the Court may determine liability on a collective-wide basis.  *Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 698 (N.D. Ga. 2015). In this Circuit and in this District, the standard for whether a collective action may move forward is a Fed. R. Civ. P. Rule 23(b)(3) standard:  whether there are questions of law and fact that are common to the collective, and whether those common questions predominate over questions affecting only individual members.  *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771-72 (7th Cir. 2013) ("despite the difference between a collective action and a class action and the absence from the collective-action section of the Fair Labor Standards Act of the kind of detailed procedural provisions found in Rule 23 . . . there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences." (internal citation omitted)); *see also Boelk v. AT&T Teleholdings Inc.*, No. 12-CV-40-BBC, 2013 WL 239066, at *14-15 (W.D. Wis. Jan. 10, 2013) (Crabb, J.) (using Rule 23 standard to evaluate the propriety of collective action certification after discovery); *Ruiz v. Serco, Inc.*, No. 10-cv-394-bbc, 2011 WL 7138732, at *6 (W.D. Wis. Aug. 5, 2011) (Crabb, J.) (applying Rule 23 standards from *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-53 (2011) to collective action).  As *Dukes* holds, this means that "what matters to [collective] certification . . . is not the raising of common questions -- even in droves -- but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed [collective] are what have the potential to impede the generation of common answers."  *Dukes*, 564 U.S. at 350 (emphasis in original; internal citations omitted).  Using this case law, Judge Crabb  explained that, in a collective action challenging an exempt status classification, "it is not enough for plaintiffs to raise

5

a common question as to whether they and other employees with some similar job duties were properly classified as exempt. Rather, the answer to that question must be susceptible to proof that can be extrapolated to the class plaintiffs seek to represent." *Ruiz*, 2011 WL 7138732 , at*6.

Poland bears the burden of establishing that she and others in the collective are similarly situated. *Id.*; *see also Drenckhan v. Costco Wholesale Corp.*, No. 08-CV-1408, 2010 WL 11508343, at *2 (C.D. Cal. Sept. 14, 2010) ("Under the second-tier analysis, [t]o certify a FLSA collective action, the court must evaluate whether the proposed lead plaintiffs and the proposed collective action group are similarly situated for purposes of § 216(b). Plaintiffs bear the burden of making this showing." (internal citations and emphasis omitted)); *see also Miller v. ThedaCare Inc.*, No. 15-C-506, 2018 WL 472818, at *11 (E.D. Wis. Jan. 18, 2018) (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2001)).

## II.   THE COURT SHOULD DECERTIFY THE COLLECTIVE ACTION BECAUSE POLAND CANNOT MEET HER BURDEN OF SHOWING THAT SHE AND THE OPT-INS ARE SIMILARLY SITUATED

Poland cannot show that she can sustain a collective action through proof that can be extrapolated to a nationwide collective working in different locations and under different managers. To prevail on a collective basis, Poland must overcome Springs' two exemption defenses: the outside sales exemption and the administrative exemption. Due to the varying testimony on the extent to which Poland the Opt-Ins made sales and exercised discretion and independent judgment, this cannot be done on a collective basis.

### A.   Analyzing Outside Sales and Administrative Work Is An Individualized, Fact-Intensive Inquiry

Whether an employee is entitled to overtime "is a complex, disputed issue, and its resolution turns on exemption, which in turn will require the court to decide a number of subsidiary questions." *Myers*, 624 F.3d at 548. Put another way, determining whether an employee is exempt

6

from the FLSA's overtime requirements is a "highly fact-intensive inquiry that must be made on a case-by-case basis in light of the totality of the circumstances." *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 908 (E.D. La. 2009); *see also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) (stating "[o]ften, this exemption will militate against certification because, as the district court noted, it requires a fact-intensive inquiry into each potential plaintiff's employment situation" regarding the federal outside sales exemption (quotation marks omitted)).

A court considering the outside sales and administrative exemptions must decide several underlying questions pertaining to each exemption criteria and determine whether the duties of the members of the putative collective "were similar in ways material to the establishment of the exemption criteria." *Myers*, 624 F.3d at 549. The fact that Poland and the Opt-Ins share a similar job title does not satisfy their burden. Indeed, as Judge Crabb held in *Ruiz*, "it would be difficult to generate common answers in light of the individualized inquiries arising from the wide variations in duties, experience, responsibility, discretion and supervisors on part of the potential class members . . . the class definition . . . include[s] . . . [those] whose primary job responsibilities and levels of discretion vary significantly from those of plaintiffs . . . [and] it would be impossible to determine on a collective basis whether the class members are classified properly." 2011 WL 7138732, at \*6-7; *see also Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 538 (3d Cir. 2012) ("[b]eing similarly situated does not mean simply sharing a common status").

Recognizing the difficulty inherent in allowing cases challenging application of an FLSA exemption to proceed on a collective basis, numerous courts have declined to allow FLSA claims to proceed to trial on a collective basis if application of the exemption requires individualized inquiries. *See, e.g.*, *Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 702 (N.D. Ga. 2015)

(decertifying collective action challenging whether employees were exempt under the administrative and/or executive exemptions because "[g]iven the material distinctions between the respective job duties of the Plaintiffs, the Court would still have to conduct a separate analysis for each Plaintiff to determine whether that [exemption] defense applies to him or her"); *see also Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 927 (D. Ariz. 2010) (denying conditional certification as to a proposed collective of sales and marketing representatives and observing that "whether an employee has been properly exempted under the FLSA['s administrative exemption] necessitates a fact specific inquiry"); *Trinh v. JP Morgan Chase & Co.*, No. 07-CV-1666, 2008 WL 1860161, at *4 (S.D. Cal. Apr. 22, 2008) (denying conditional certification where question of "whether JPMorgan loan officers are 'exempt' necessarily involves a fact-by-fact inquiry into the circumstances of each employee to see if he or she falls within an administrative, outside sales, highly compensated, combination, or any other exemption"); *Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-CV-0840E(SR), 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005) (denying conditional certification where analysis of exemption would require "determination of every individual [plaintiff's] exempt or nonexempt status"); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) (executive exemption required "fact-intensive determination" and examination of employees' day-to-day tasks); *Myers*, 624 F.3d at 547-52 (certification properly denied where examining application of executive exemption would require highly individualized analysis regarding each individual's duties).

### B.   The Factual And Employment Circumstances Of Poland And The Opt-Ins Vary Widely

Poland alleges that Springs misclassified her and the Opt-Ins as exempt under the outside sales and administrative exemptions.  Accordingly, to determine whether Poland and the Opt-Ins are similarly situated, the Court "must consider the salient factors in an [administrative] exemption

analysis." *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1100, 1104-05 (D. Kan. 2012) (decertifying collective action even though opt-ins performed "between 80 to 90 percent of their time doing manual labor" because, among other things, some opt-ins testified that they were "simultaneously performing management duties and manual labor," others testified that "their managerial duties were more important than any manual labor activities they might be performing," and others testified that "manual labor tasks took precedence").

The factual and employment circumstances of Poland and the Opt-Ins, all of whom worked in different parts of the country and for different managers, vary widely. As a result, those variances make it impossible to decide whether the outside sides and administrative exemptions applies to all of them on an all-or-nothing basis in one collective proceeding.

### 1.    Poland And The Opt-Ins Testimony Regarding The Extent Of Their Outside Sales Work Varied Widely

Whether members of the collective are exempt under the outside sales exemption cannot be decided on a collective basis. The outside sales exemption applies to an employee if: (1) his/her "primary duty is . . . making sales within the meaning of" 29 U.S.C. § 203(k); and (2) he/she "is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a).

The second part of the outside sales exemption test likely is undisputed in this case, as Poland and the Opt-Ins all testified that they did not have an office at Springs' headquarters in Wisconsin and performed their duties at major retail stores and Budget Blinds franchises in their territory and their homes.[2] But as to the first prong of the exemption -- a primary duty of making

---

[2] *See e.g.*, **Ex. 1**, Deposition of Michelle Poland ("Poland Dep."), Mar. 2, 2022, 34:24-25; 35:1-7; **Ex. 2**, Deposition of Cynthia McClintock ("McClintock Dep."), Mar. 22, 2022, 42:17-24; 43:1-10; **Ex. 3**, Deposition of Diana Rainsberry ("Rainsberry Dep.") Mar. 9, 2022, 30:10-18; **Ex. 4**, Deposition of James Nader ("Nader Dep."), Mar. 17, 2022, 43:4-8; **Ex. 5**, Depositions of Janel Grant ("Grant Dep."), Mar. 4, 2022 and Mar. 8, 2022, 22:12-19; **Ex. 6**, Deposition of Kristen

sales -- the testimony of Poland and the Opt-Ins varies widely.  In fact, for every FSR "who says one thing about his or her job duties and responsibilities, another says the opposite." *Beauperthuy v. 24 Hour Fitness USA, Inc.,* 772 F. Supp. 2d 1111, 1130-31 (N.D. Cal. 2011).  This makes an all-or-nothing trial on all of their claims in one proceeding as to this exemption impossible.

The record reflects vast differences in the working experiences of Poland and the Opt-Ins. As explained in more detail in Springs' summary judgment motions filed contemporaneously with this motion, the DOL regulations state that "'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 C.F.R. § 541.501(b).  The U.S. Supreme Court has made clear that the outside sales exemption applies "whenever an employee 'in some sense make[s] a sale,'" noting that the inquiry must take into account "an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 149, 161 (2012).  On the record developed in discovery, Poland and the Opt-Ins presented widely varying testimony with respect to the extent to which they made sales under these principles.

Specifically, the testimony of Poland and the Opt-Ins varied widely on how often they engaged in "selling events" in which they set up a table at a retail store with brochures, literature, hand samples, sample books, and/or sometimes candy or cookies to attract end-customers and the extent to which they made sales directly to end-customers during these events.  (*See* **Ex. 5**, Grant

---

Gettel-Barrett ("Gettel-Barrett Dep."), Mar. 22, 2022, 43:19-24; 44:1-3; **Ex. 7**, Deposition Leonard Stovall ("Stovall Dep."), Mar. 23, 2022, 51:16-24; **Ex. 8**, Deposition of Linda Jackson ("Jackson Dep."), Apr. 4, 2022, 46:24-25; 47:1-23; **Ex. 9**, Deposition of Marissa Wheeler ("Wheeler Dep."), Mar. 18, 2022, 22:6-22; **Ex. 10**, Deposition of Scott Teitelbaum ("Teitelbaum Dep."), Mar. 16, 2022, 31:25; 32:1-10; **Ex. 11**, Deposition of Steve Albertson ("Albertson Dep."), Mar. 10, 2022, 27:3-21; **Ex. 12**, Deposition of Sheryl Hoover ("Hoover Dep."), Mar. 24, 2022, 53:20-24; 54:1-17; **Ex. 13**, Deposition of Valerie Askew ("Askew Dep."), Mar. 17, 2022, 28:4-16.

Dep. 35:21-24; 36:1-6; **Ex. 6**, Gettel-Barrett Dep. 57:22-24; 58:1-23; 60:1-12; **Ex. 7**, Stovall Dep. 63:23-24; 64:1-18).

For example, Opt-in Nader and Plaintiff Poland testified that they respectively participated in 60 and 48 selling events each year (**Ex. 4**, Nader Dep. 47:10-24; 48:1-24; 49:1-15; 61:6-22; **Ex. 1**, Poland Dep. 42:12-25; 43:1-25; 44:1; 45:11-15; 49:1-6; 70:12-24; 71:1-25; 72:1-2; 163:2-23 (participated in sales events four times per month), thus making it more likely that, under their own testimony, their primary duty was making sales. In contract, however, Opt-ins Rainsberry, Albertson and Hoover testified that they respectively participated in only ten, five to six, and zero selling events each year, (**Ex. 3**, Rainsberry Dep. 183:15-24; 184:1-8; 71:11-24; 72:1-24; **Ex. 11**, Albertson Dep. 46:22-24; 47:1-24; 48:1-24 (more than 150 selling events in 27 years, which average to five to six per year); **Ex. 12**, Hoover Dep. 71:21-24), thus making it less likely that, under their own testimony, their primary duty consisted of selling.

Poland and the Opt-Ins' testimony also varied drastically on whether they actually interacted with end-customers during such selling events. Poland, Grant, Rainsberry, Nader, and Albertson admitted that would make sales directly to end-customers to educate them on Springs' products and special promotions and otherwise interact with customers to answer their questions in an effort to drive sales, making it more likely that their primary duty constitute sales. (**Ex. 1**, Poland Dep. 42:12-25; 43:1-25; 44:1; 45:11-15; 49:1-6; 70:12-24; 71:1-25; 72:1-2; 163:2-23; **Ex. 5**, Grant Dep. 35:21-24; 36:1-3 (testifying that she "regularly" made sales directly to end-customers during selling events); **Ex. 3**, Rainsberry Dep. 71:11-24; 72:11-24; 73:11-24; 74:1-6; 105:10-24; 106:1-4 (explaining that would convince, inform, and educate end-customers during selling events); **Ex. 4**, Nader Dep. 47:10-24; 48:1-24; 49:1-15; 61:6-22 (testifying that he: "would interact with store customers and give them product knowledge,"; interact with customers with

store associates to "answer questions, the ones that the associates don't know"; and/or train store associates if no customers were present with the purpose of train[ing] associates and "drum[ming] up sales for the store."); **Ex. 11**, Albertson Dep. 46:22-24; 47:1-24; 48:1-24 (testifying that customers would come up to him directly during selling events)).

Conversely, Jackson testified that during selling events, she wasn't "really…selling to the end-user.  We were just setting up, you know, tables showing our products out there." (**Ex. 8**, Jackson Dep. 53:10-24).  She claimed that she was just "there to help store associates if the consumer had questions they couldn't answer."  (*Id*.)  Teitelbaum testified that he engaged in selling events, but the customers only came up to his table because it was decorated with balloons and giveaways, like candy and pens, which they would take and walk away before he could discuss Springs product.  (**Ex. 10**, Teitelbaum Dep. 38:19-25; 39:1-25; 40:1-18; 143:8-17) (explaining that people would ask to take his giveaways, " 'Nope, take it,' and the[y're] off.  Here in New York, anything that's free they take.").  Stovall claimed that he "typically did not" interact with end customers.  (**Ex. 7**, Stovall Dep. 65:9-24; 66:1-24; 67:1-5).  Stovall even went as far as to testify that it was only the store associate's job to interact with customers and that he would only speak to the store associate, who could then, in turn, answer the customer's question.  (*Id*. 65:9-24; 66:1-24; 67:1-5) (testifying that if a customer asked him a direct question he would tell them that he had to get a store associate to speak with them and would not speak substantively about Springs' products whatsoever).  Stovall further stated that if he was at a selling event and the retail associate went to lunch and a customer came to the table and asked about a product, he testified that he did "engage with that customer, [but] not in any sales capacity because if it went to that discussion, then [he] would have to wait for an associate."  (*Id*. 176:10-19).  Their testimony makes it less

likely that they were engaged in sales (or that they were performing their jobs as expected by their employer).

The testimony of Poland and the Opt-Ins also varied widely on how often they interacted with end-customers outside of "selling events," with some testifying to facts that would make application of the outside sales exemption unlikely and others, particularly Rainsberry, testifying in a manner in which selling directly to customers is their primary duty. The following chart is illustrative:

| Frequency of End-Customer Interactions Outside of Selling Events | FSR Name |
|---|---|
| Rarely and only on single incidents | **Ex. 8**, Jackson Dep. 86:11-25; 87:1-22; 90:2-13; 95:19-22 (qualifying times that she was called in to help a customer with selecting Springs product when no one was in the store and when she was unable to train store associates "due to the number of customers in the store who wanted to take advantage of the 40 percent off sale" causing her to spent her "entire time with customers."). |
| 5% of her job | **Ex. 12**, Hoover Dep. 121:24; 122:1-7 (on interacting with store customers). |
| "On occasion," and "a couple times per week" but not on every single store visit or on a daily basis | **Ex. 10**, Teitelbaum Dep. 79:3-25; 80:1-25; 81:1-25; 142:22-25; 143:1-24 (denying that he had regularly face-to-face interactions with store customers on every store visit, but admitting "it happened" a couple times per week and when it did he was training them on the features and benefits of Springs products.) |
| Regularly, during daily sales visits | **Ex. 5**, Grant Dep. 68-75; 112-118, 132; 172:10-17) (on making sales directly to end-users when demonstrating sales techniques and/or assisting sales associates and franchise owners during daily sales visits); *Id.* 73:24; 74:1-24; 75:24 (engaging with end-customers in this way was something that she did regularly and it was important part of her job). |
| Regularly | *See generally* **Ex. 13**, Askew Dep. 52:20-24; 53-59; 60:1-3 (demonstrating that she regularly interacted with end customers face-to-face to educate them on products, shop at home programs and called end customers to follow up on open quotes and orders). |
| 50% of her job | **Ex. 3**, Rainsberry Dep. 107:20-24; 108:1-6 (on "working with [end-]customers directly to help them find a Springs Window product that [met] their needs, make a sale.") |

The testimony of Poland and the Opt-Ins thus shows that they are not similarly situated with respect to how often they conducted selling events, how often they engaged with end customers at selling events, and the extent to which they interacted with end-customers outside of these events on a daily basis.

In *Tracy v. NVR, Inc*., 293 F.R.D. 395, 398 (W.D.N.Y. 2013), *aff'd sub nom. Gavin v. NVR, Inc*., 604 F. App'x 87 (2d Cir. 2015), the court decertified a collective of sales and marketing representatives because of the highly individualized circumstances of their job duties – namely, they worked under different managers, in different locations, and worked out-of-office to varying degrees and in different ways.  Similar job descriptions, training, duties, and compensation were insufficient for plaintiffs to proceed as a class because the employees "had broad discretion to decide how to allocate their time -- as borne out by the appreciable variations in the time spent on sales activities."  *Id*. at 399.  Ultimately, the plaintiffs failed to meet their burden to demonstrate that they had sufficiently similar factual and employment settings for purposes of the FLSA, that the defenses available to the employer would be similar for each plaintiff, or that the interests of fairness or judicial economy would be preserved by the further pursuit of this action as a collective one.  *Id*. at 398-99.  Here too, the Court should similarly find that the Opt-Ins' testimony was too varied and individualized for them to be similarly situated.

### 2. Poland And The Opt-Ins Testimony Regarding The Extent Of Their Administrative Work Varied Widely

The administrative exemption applies to an employee if: (1) he/she is paid on a salary basis; (2) his/her primary duty consists of the performance of office or non-manual work directly relates to Springs' management policies or general business operations of Springs or its customers; and (3) his/her work includes the exercise of discretion and independent judgment over matters of significance.  29 C.F.R. § 541.200.  Salary basis does not appear to be in contention, as Poland and

all the Opt-Ins testified that they are or were paid on a basis in excess of $684 per week and always understood that they would receive the same amount of base salary even if they worked in excess or fewer than 40 hours per week.[3]  But the varying testimony of Poland and the Opt-Ins on the second and third prongs of the administrative exemption makes an all-or-nothing trial on all of their claims in one proceeding impossible.

### i.    Poland And The Opt-Ins' Gave Exceedingly Varied Testimony On The Performance of Manual Or Administrative Work

Wide variance exists in the testimony on the extent which Poland and the Opt-Ins' primary duties consisted of non-manual work, and thus whether they satisfy the second prong of the administrative exemption.

Some Opt-Ins claimed that they spent the majority of their time doing manual work.  For example, Hoover testified that at the retail level, "most of [her] time was spent repairing machines, fixing machines, merchandising, and fixing displays." (**Ex. 12**, Hoover Dep. 139:10-24).  She claims this work probably took up 75 percent of her time." (*Id.* 157:2-6).  Teitelbaum testified that his primary duties were doing manual labor and installing and resetting displays and training retail store associates and franchise clients.  (**Ex. 10**, Teitelbaum 32:15-18; 137:1-25; 138:1).  Nader claimed that he regularly spent at least a half an hour per client performing "physical work" on the displays characterizing it as his "main job" as an FSR.  (**Ex. 4**, Nader Dep. 171:11-24; 172:1-8)

---

[3] *See e.g.*, **Ex. 1**, Poland Dep. 31:5-24; 32:1-13; **Ex. 2**, McClintock Dep. 34:20-24; 35:1-24; 36:1-24; 37:1-16; **Ex. 3**, Rainsberry Dep. 26:1-24: 27:1-21; **Ex. 4**, Nader Dep. 36:17-24; 37:1-24; 38:1-16; 39:10-24; 40:1-8; **Ex. 5**, Grant Dep. 18:20-24; 19:1-16; 20:11-24; 21:1-15; **Ex. 6**, Gettel-Barrett Dep. 31:6-24; 32:1-12; **Ex. 7**, Stovall Dep. 32:24; 33:1-24; 34:1-24; 35:1-8; **Ex. 8**, Jackson Dep. 37:20-24; 38:1-24; 39:1; **Ex. 9**, Wheeler Dep. 18:16-24; 19:1-23; **Ex. 10**, Teitelbaum Dep. 27:20-24; 28:1-24; 29:1-19; **Ex. 11**, Albertson Dep. 22:10-24; 23:1-22; **Ex. 12**, Hoover Dep. 45:24; 46:1-24; 47:1-24; **Ex. 13**, Askew Dep. 24:1-24; 25:1-7.

On the other hand, Miller testified that she spent the "majority of her time" on "training or influencing." (**Ex. 14**, Deposition of Susan Miller ("Miller Dep."), Apr. 11, 2022, 159:3-5). Grant testified that she "tr[ies] to train a little bit at each visit no matter if it's a Budget Blinds or retails[sic]." (**Ex. 5**, Grant Dep. 27:11-17). Teitelbaum also admitted that he spent a lot of his time conducting (mostly informal) specialized product training about product "benefits and features" with retail associates and franchise owners on his sales calls to drive sales of particular products throughout the year. (**Ex. 10**, Teitelbaum Dep. 35:2-24; 36:1-24; 37:1-6; 42:21-25; 43:1-5; 44:22-25; 45:1-16; 137:4-25; 138:1). Askew testified straight down the middle, claiming that 50 percent of her work was manual and 50 percent of her work was administrative work. (**Ex. 13**, Askew Dep. 103:21-24; 104:1-24; 105:-1-24; 106:1-19). She also testified that "there was no labor involved with dealing with Budget Blinds at all." (*Id.*)

### ii. Poland And The Opt-Ins' Testimony On The Extent To Which They Exercised Discretion and Independent Judgment Varies Widely

Likewise, as to the third prong of the administrative exemption, the testimony of Poland and the Opt-Ins also varied widely on the extent to which they exercised discretion and independent judgment in performing their job duties. The testimony varied drastically in the manner that Poland and the Opt-Ins trained and prepared to train their clients.

Teitelbaum, for instance, testified that he would do the same training at some regular interval at every single one of his accounts with no variation whatsoever based on a PowerPoint presentation that was given to him by Springs. (**Ex. 10**, Teitelbaum Dep. 38:3-15). Poland also testified that she used training PowerPoints that were pre-made by Springs without modifying them to educate store associates. (**Ex. 1**, Poland Dep. 53:3-10).

Conversely, Gettel-Barrett testified that when she was creative and inventive in training her clients.  (**Ex. 6**, Gettel-Barrett Dep. 163:21-24; 164-166; 167:1-16).  For example, she incorporated a Jeopardy game into her training sessions in which she gave out prizes to her clients for correct answers.  (*Id*.)  She testified:

> Q.  And then you said that sometimes you even played games, and said there was a Jeopardy game.
> A.  Yes.
> Q.  What was that Jeopardy game about?
> A.  So basically with the Jeopardy game it was the board like Jeopardy and then there were questions behind like the $200, $300, $400 questions, and the associates would pick whatever the category was and then whatever dollar amount, just like the Jeopardy game, and then there would be the answer behind there, and they would have to fill the question. The associates would have to fill the question based on what was trained upon.
> Q.  Okay.  So the content of the Jeopardy game was about Springs Windows products?
> A.  Oh, yes.  Definitely.
> Q.  Did you ever give prizes for the winners?
> A.  Yes.
> Q.  What did you give?
> A.  T-shirts, hats, candy.
> Q.  Anything else?
> A.  Lottery tickets.

(*Id*.)  Gettel-Barrett further testified that she and another sales representative, Kenda Richardson, got the idea for the game from another sales representative, but made the Jeopardy board themselves and decided how to incorporate information that was given to them from corporate into the game.  (*Id*.)

Grant (a current Springs' employee) testified that she tries to conduct training at every store or franchise visited.  (**Ex. 5**, Grant Dep. 27:11-24; 28-30; 31:1-2).  She did large group trainings at retail stores several times per year before the COVID pandemic and currently focuses on small group trainings with five or six people and conducts mostly informal one-on-one trainings.  (*Id*.)  She focuses on new products and product updates and tailors her training sessions to the particular store associate with whom she is working.  (*Id*.)  She explained that her training "varies by what type of an associate you're working with.  If it's someone like a specialist in-home decor, you're

going to get more in depth on details.  If it's the flooring person that's helping cover, you're going to say, do you know how to do a lead in the computer and put a name and number in there because they are not going to understand the nitty gritty.  Or care."  Sometimes Grant uses PowerPoints and other times she "tweak[s] them to fit her particular client.  (*Id*.)  She uses demonstrative aides such as hand samples and sample books to showcase the products she is training about.  (*Id*.)  She also testified that she teaches retail store associates how to use their own discretion in "qualify[ing]" customers for different product levels based on their specific product needs and budget and make the best product recommendation to ensure a successful sale.  (*Id*. 36:18-24; 37-40; 42:2).

Wheeler trained on a wider range of topics, training not just product knowledge and benefits but also on topics ranging from product decals, to how to install and uninstall, to the benefits of Springs products and aesthetics in comparison to competitors' brands.  (**Ex. 9**, Wheeler Dep. 26:13-24; 27:1-24; 28:1-24; 29:1-24; 30:1-24; 31:1-15).  To prepare for training, particularly larger training sessions, she collaborated with other FSRs and met to discuss what topics to discuss.  (*Id*.)  She decided what to train based on what was "currently selling" in a particular retail store, what products were "most popular," and the season, but "[i]it really depended."  (*Id*.)  She also decided to train store associates on products that were not selling in order to make them more comfortable with those products.  (*Id*.)  In order to make that determination, Wheeler analyzed sales reports on a daily basis at her clients to see what was and was not selling.  (*Id.*)

Unlike the other FSRs, Nader did not often use PowerPoint presentations during his trainings.  (**Ex. 4**, Nader Dep. 56:1-24; 57:1-24; 58:1-19).  Nader testified that due to the "revolving door" of associates at retail stores, he often found himself doing informal one-on-one trainings with individual store associates to get them up to speed on products if they were new or gave other

appropriate training based on a given employee's knowledge and tenure. (*Id*.). He also testified that he regularly trained store associates on how to ask "the right questions" to "determine what to recommend to store end-customers." (*Id*. 142:2-24; 143:1-2). Nader also tailored his trainings based on feedback from his clients, testifying that, when store associates gave him feedback about training and if they did not like the content of his presentation, he would incorporate that feedback into his next training session. (*Id*. 126:1-24; 127:1-24).

Poland and the Opt-ins were also varied in their testimony as to how they used their discretion and independent judgment to build relationships with their clients. For example, Grant testified that she brings in candy or cookies or provides lunch to thank store associates for selling Springs' products. (**Ex. 5**, Grant Dep. 47:23-24; 48:1-24; 49:1-4). Grant also testified that she participated in a brainstorming call to provide her thoughts on ways to build relationships with her clients. (*Id*. 94:19-24; 95:1-24; 96:1-24; 97:1-24). She obtained approval to issue gift cards to her clients for their sales efforts. (*Id*.) Poland decided to give out award certificates to recognize high sales. (**Ex. 1**, Poland Dep. 51:24-25; 52:1-25; 56:10-16; 151:1-25; 152:1-24; 153:1-24; 154:6-11; 206:9-24). Poland also showed appreciation by providing pens and making "goodies bags" containing candy for retail store associates. (*Id*.). She took her Budget Blinds clients out for meals, gave them goodie bags, and even provided a certain franchise owner with a batch of cookies. (*Id*.) She testified "I always attached my business card to it. That way, they knew how to reach me." (*Id*.) As mentioned, Gettel-Barrett testified that she developed a Jeopardy training game to teach sales associates about Springs' products during which she gave out t-shirts, hats, candy, and lottery tickets. (**Ex. 6**, Gettel-Barrett Dep. 164:5-24; 165:1-6).

Conversely, other Opt-Ins testified that they did not employ giveaways in training store associates or find other creative ways to build relationships with their clients. (**Ex. 12**, Hoover

Dep. 32:4-10; **Ex. 7**, Stovall Dep. 69:1-24; 70:1-9).  Others did not testify about employing such techniques *at all* to build relationships. (*See generally*, **Ex. 4**, Nader Dep.).

Further, certain FSRs also had additional job duties that demonstrate their discretion and independent judgment, while others did not perform those duties.  For example, unlike most of the Opt-Ins, Hoover and Nader trained and mentored other FSRs. Hoover testified that she was "an excellent trainer of new people" and that Springs "would shuffle new people in to [her] to mentor them." (**Ex. 12**, Hoover Dep. 36:7-12).  She explained that she trained and mentored ten or eleven new FSRs during her tenure for approximately one year to ensure that they were "catching on." (*Id*. 36:2-24; 37:1-24; 38:1-24; 39:1-24; 40:1-4).

Nader, meanwhile, was "selected to oversee training for all new field sales representatives for the Company based on [his] superior leadership, effective communication style, and sales performance." (**Ex. 15**, Nader Dep. Ex. 1; **Ex. 4**, Nader Dep. 26:21-24; 27:1-24; 28:1-24; 29:1-11; 76:1-15).  Nader conducted one-on-one training with individual FSRs when they were hired.  The length of time that he conducted trained varied considerably, but he estimated that he was often on location with new FSRs for approximately two to three days.  (*Id*.)  He explained that the training was "basically…a ride along.  So, I would ride along with them to new stores, and just observe, and let them know how CRM worked."  (*Id*.)  He would give new FSRs targeted feedback on whether he thought their communication style was appropriate with their store associate clients. (*Id*.) (explaining that communication style training was "mostly…for how they were handling associates in the stores, and then give them feedback when we got back in the car.")  He also stepped in when he thought it was appropriate to help the FSR train store associates on product knowledge.  (*Id*.)  In sum, he shadowed new FSRs and gave them off-the-cuff on-the-job training and performance feedback with their client.  (*Id*.  (Q.  Okay.  So, kind of you're giving them on

the job training?   A.   Exactly.   Q.   Watch me so that you can understand what to do, okay.   A. Correct."))

Nader also claimed in his resume that he "serve[d] as the [Client Relationship Management software] Subject Matter Expert for the company," claiming that he worked "directly with corporate administrators and software providers to integrate and update application specifications."   (**Ex. 15**).   He testified that throughout his employment he was a CRM "super user" and it was his job as a super user to give feedback on the app to make it user friendly.   (**Ex. 4**, Nader Dep. 83:10-24; 84:1-21).   He was a spokesperson for his region to articulate issues with the mobile app to see if they could be fixed. (*Id.*)

At bottom, and based solely on the testimony of Poland the Opt-Ins, the extent to which they exercised discretion and independent judgment in the various facets of their job makes it clear that there are no common answers on the issues that will drive this litigation: the extent to which they made sales, performed manual or non-manual work, and exercised discretion and independent judgment.   Rather, individualized issues plague this case, with each Opt-In's exempt status needing to be determined on a case-by-case basis based on what exactly each FSR did, working in a different part of the country and often for a different manager.   Indeed, this is one reason why Springs contemporaneously moved for summary judgment on the claims of some Opt-Ins whose deposition it took, but not on others.   On this record, a collective action cannot be maintained.

## III.   THIS MATTER CANNOT PROCEED AS A COLLECTIVE ACTION BECAUSE THERE IS NO FEASIBLE TRIAL PLAN

Even if Poland could show that she and the Opt-Ins are similarly situated at this stage, her case cannot proceed to trial as a collective action because she cannot submit a feasible trial plan. As explained in Section II of this brief, this is not a case where collective relief can be obtained through the use of statistics or other data.   *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.

442 (2016) (permitting an FLSA collective action for payment of donning and doffing time to proceed on the basis of expert testimony and a time study).

Nor can this case be brought on a collective basis through the testimony of a few on behalf of the many. Again, *Espenscheid* controls here. There, the plaintiffs claimed that their employer failed to pay them for all overtime hours worked in violation of the FLSA, and 2,341 opt-ins joined the case. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773-74 (7th Cir. 2013). Plaintiff proposed proceeding in a collective fashion in the Western District of Wisconsin through the testimony of 42 of them, which would then be extrapolated to the remaining 2,341 opt-ins. The district court rejected this and decertified the case, whose decision was affirmed by the Seventh Circuit. It reasoned that:

> The plaintiffs proposed to get around the problem of variance by presenting testimony at trial from 42 "representative" members of the class. Class counsel has not explained in his briefs, and was unable to explain to us at the oral argument though pressed repeatedly, how these "representatives" were chosen—whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and hand picked to magnify the damages sought by the class. There is no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members to be the witnesses, or more precisely random samples, each one composed of victims of a particular type of alleged violation.
> . . .
>
> To extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage.

*Id.* at 774.

Just so here. Plaintiffs only trial plan disclosed to Springs has been a list of Opt-Ins who they intend to call to testify, plus the named plaintiff Poland, titled "Plaintiff's Disclosure of Representative Sample of Testifying Plaintiffs." **Ex. 16**, Jan. 7, 2022. That list originally included twelve witnesses, plus Poland. After a group of Territory Sales Managers withdrew from the case,

*see* ECF No. 83, 84, 85, the number of so-called representative trial witnesses shrank to eight, plus Poland.  Those nine individuals presumably are intended to representative of the entirety of the 35 individuals in total who have filed consents to join this case, and presumably, if a jury finds the nine total testifying plaintiffs to be non-exempt and thus entitled to back overtime pay, then that verdict would extend to the remaining 26 non-testifying plaintiffs, and all would receive back overtime pay.  If, however, the jury were to find that those ten testifying plaintiffs were classified correctly as exempt, then those 26 non-testifying plaintiffs would have a judgment entered against them.  As in *Espenscheid*, there is "no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members to be the witnesses."  *Id.*  As in *Espenscheid*, there is no explanation if these representatives "were volunteer[s], or perhaps selected by class counsel after extensive interviews and hand picked to magnify the damages sought by the class."  *Id.*  With this trial plan, this case cannot proceed as a collective action and must be decertified.

## CONCLUSION

For the foregoing reasons, Springs respectfully requests that this Court grant its motion decertify the collective action and dismiss the Opt-Ins' claims without prejudice.

Dated: May 13, 2022

Respectfully submitted,

SPRINGS WINDOW FASHIONS, LLC

*s/ Christina Jaremus*
Noah A. Finkel
Christina Jaremus
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
(312) 460-5000
nfinkel@seyfarth.com
cjaremus@seyfarth.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, Christina Jaremus, hereby certify that on May 13, 2022, a true copy of the foregoing document was served via the Court's CM/ECF filing system on the following Counsel for Plaintiffs:

> Gordon E. Jackson
> J. Russ Bryant
> Robert E. Turner, IV
> Robert E. Morelli, III
> JACKSON, SHIELDS, YEISER, HOLT
> OWEN & BRYANT
> 262 German Oak Drive
> Memphis, Tennessee 38018
> Telephone: (901) 754-8001
> Facsimile: (901) 754-8524
> gjackson@jsyc.com
> rbryant@jsyc.com
> rturner@jsyc.com
> rmorelli@jsyc.com
> *Attorneys for Plaintiffs*
>
> *s/ Christina Jaremus*