## IN THE UNITED STATES DISTRICT COURT FOR
## FOR THE WESTERN DISTRICT OF WISCONSIN
## MADISON DIVISION

| | |
|---|---|
| MICHELE POLAND, individually and on behalf of herself and others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>SPRINGS WINDOW FASHIONS, LLC, a Delaware Limited Liability Company,<br><br>     Defendant. | Case No. 3:21-cv-00165-jdp<br><br>Chief Judge James D. Peterson<br>Magistrate Judge Stephen L. Crocker |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY THE COLLECTIVE ACTION

This is a Fair Labor Standards Act ("FLSA") collective action. *See* 29 U.S.C. § 216(b). Plaintiff Michele Poland brought this matter on behalf of herself and similarly situated Field Sales Representatives ("FSRs").[1] Ms. Poland claims Springs Window Fashions, LLC ("Defendant" or "Springs") misclassified FSRs as exempt from the overtime provisions of the FLSA.[2] Defendant claims that FSRs are properly exempt from overtime pay under the FLSA's Administrative Exemption and Outside Sales Exemption.[3]

The Parties stipulated to conditional certification in April of 2021.[4] Thereafter, notice of this

---

[1] The First Amended Complaint (ECF No. 26) also included Territory Sales Managers ("TSMs"). All TSMs have recently withdrawn from this case, and this matter is proceeding solely on behalf of Ms. Poland and 34 other FSRs.

[2] *See generally* First Am. Compl. (ECF No. 26).

[3] Answer to First Am. Compl. (ECF No.) at ¶ 43.

[4] *See* Order on Parties' Stipulation on Plaintiff's Motion for FLSA Conditional Certification (ECF No. 56).

lawsuit was disseminated and the Parties' subsequently conducted class-wide discovery. With discovery now closed, Defendant has filed a Motion to Decertify the Collective Action.

In that Motion, Defendant makes a few bold claims. First, it suggests that cases where an employer asserts the Administrative Exemption and/or the Outside Sales Exemption are inherently unsuited for collective trial.[5] It then claims that the "factual and employment circumstances of Poland and the Opt-Ins . . .  vary widely."[6] It closes out its Motion with a few comments on the feasibility of this collective trial.[7]

These arguments all fall short. Misclassification cases, such as this one, are perfectly capable of collective adjudication. Next, the evidence in this case – including the company's own admissions – demonstrates a uniform set of employment circumstances and experiences. Moreover, Plaintiff has a feasible trial plan: the testifying witnesses in this case were selected as representatives from across the nation. This allows the jury to see just how uniform the experiences of FSRs are. Finally, if Defendant's Motion is granted, the Court should equitably toll the claims of the 34 other FSRs for a period of 30 days.

For these reasons, discussed below, Defendant's Motion should be denied. This matter should procced to trial collectively.

## I.    STANDARD OF REVIEW

FLSA collective actions are not Fed. R. Civ. P. 23 class actions. While both are representative actions, class members must affirmatively "opt-in" to participate in a collective action. *Woods v.*

---

[5] Defendant's Memorandum of Law in Support of Its Motion to Decertify the Collective Action (ECF No. 86) at 6-8, hereinafter "Def's Mem."

[6] *Id.* at 9.

[7] *Id.* at 21-13.

*N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982). Over time, courts have developed a two-stage process for collective action certification. "The second step in an FLSA collective action—generally upon a defendant's motion for decertification—involves determining whether plaintiffs who have opted into the lawsuit are, in fact, similarly situated." *O'Leary v. Humana Ins. Co.*, No. 17-C-1774, 2020 U.S. Dist. LEXIS 222782, at *4 (E.D. Wis. Nov. 30, 2020) (citing *Brabazon v. Aurora Health Care, Inc.*, No. 10-C-714, 2011 U.S. Dist. LEXIS 37057, 2011 WL 1131097, at *2 (E.D. Wis. Mar. 28, 2011).[8]

The Court has three factor to consider at the decertification stage: (1) the similarity of factual and employment settings; (2) whether affirmative defenses must be applied on a collective basis; and (3) fairness and procedural concerns. *Bitner v. Wyndham Vacation Resorts, Inc.*, No. 13-cv-451-wmc, 2016 U.S. Dist. LEXIS 179661, at *41-46 (W.D. Wis. Dec. 28, 2016). Cries of individualized damages hearings alone are not a "sufficient reason in and of itself to decertify . . . so long as liability can be established for the class as a whole." *Meadows v. NCR Corp.*, No. 16 CV 6221, 2020 U.S. Dist. LEXIS 37149, at *31 (N.D. Ill. Mar. 4, 2020) At the end of the day, "[i]f common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by only a subset of those common questions." *Alvarez v. City of Chi.*, 605 F.3d 445, 449 (7th Cir. 2010).  If the question is close, courts should decline decertification. *Harris v. Chipotle Mexican Grill, Inc.*, No. 13-cv-1719 (SRN/SER), 2017 U.S. Dist. LEXIS 90302, at *43 (D. Minn. June 12, 2017).

---

[8] The Seventh Circuit has acknowledged the blurring of lines between the standards governing class actions under Rule 23 and collective actions under the FLSA. *Espenscheid v. DirectSat USA*, LLC, 705 F.3d 770, 772 (7th Cir. 2013).

## II.   ARGUMENT

a.   <u>Misclassification Cases are Appropriate for Collective Trial.</u>

At the outset of its Motion, Defendant suggests that "misclassification" cases are inherently unsuited for trial as a collective.[9] This is, of course, patently untrue. Courts regularly find that collective actions involving the FLSA's overtime exemptions should proceed to trial.

The *Long v. Epic Sys. Corp.*, No. 15-cv-81-bbc, 2016 U.S. Dist. LEXIS 119782 (W.D. Wis. Sept. 6, 2016) (Crabb, J.) decision helps illustrate this point. There, like here, the defendant argued that the plaintiffs were exempt under the FLSA's Administrative Exemption. *Id.* at *1. In its motion for decertification, Epic Systems alleged that "there were significant variations in how the opt-in plaintiffs spent their time." *Id.* at * 22. Judge Crabb rejected this argument and explained that because the "job duties remained essentially the same" that the decertification motion should be denied. *Id.* at * 23.

Matters involving the FLSA's Outside Sales Exemption are also regularly found to be suitable for collective trial. For example, in *Mode v. S-L Distribution Co.*, LLC, No. 3:18-CV-00150-KDB-DSC, 2021 U.S. Dist. LEXIS 165511, at *34 (W.D.N.C. Aug. 31, 2021) the defendant made them same arguments Springs does here; it claimed that that "individualized inquiries are needed to determine whether" the Outside Sales Exemption is met. *Id.* at *33. Seeing through this smokescreen, the court noted that this determination "is readily resolved through common evidence." *Id.* at *34.

As the above-demonstrates, a collective trial of this matter is not some herculean task.

---

[9] Def's Mem. (ECF No. 86) at 6-8.

Collective actions involving overtime exemptions are tried across the nation all the time. This case treads no new ground.

> b.  The Evidence Regarding the Outside Sales Exemption Militates Against Decertification.

Defendant's first real argument for decertification rests on the Plaintiffs' testimony regarding the Outside Sales Exemption.[10]   An employee will only be considered an "Outside Salesperson" if their primary duty is making sales. 29 C.F.R. § 541.500. For purposes of the FLSA, "sales" means "the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property . . . [and] includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 C.F.R § 541.501.

Springs hangs its hat on some testimony regarding "selling events"[11] and the degree to which FSRs interacted with "end-users."[12] Yet, the evidence uniformly demonstrates that Plaintiffs were not engaged in sales. At any rate, to the extent Defendant point out differences, those differences are immaterial to the exemption analysis.

> i.  *Selling Events.*

Defendant makes much ado about "selling events." These are "events where the FSR goes to a store location, sets up additional displays, and assists the store associates that are available, during their day to be able to give out information to customers."[13] Defendant cites the depositions of Plaintiffs Grant, Gettel-Barrett, Stovall, Nader, Poland, Rainsberry, Albertson, Hoover,

---

[10] *Id.* at 9-14.

[11] *Id.* at 10-13.

[12] *Id.* at 13-14. The term "end user" means the ultimate consumer of Defendant's products.

[13] Stovall Dep. (ECF No. 135) at 63:14-22.

Jackson, and Teitlbaum and claims their testimony "varied drastically."[14] However, their testimony is all on  these "selling events"  is uniform where it matters – that they did not engage in sales to "end users."

Defendant states that "Poland, Grant, Rainsberry, Nader, and Albertson admitted that they would makes sales directly to end-consumers"[15] at these selling events. This is a complete fabrication. Ms. Poland explained that, to the extent she even got a chance to interact with an end-user at these events, she would "make them aware of our products and then get them over to the associate" who was the salesperson.[16]  Plaintiff Grant likewise explains that these "selling" events merely involved "set[ting] up a table with brochures and some hand samples and some sample books and usually candy or cookies."[17] Ms. Grant, like all other Plaintiffs, explained that she never actually sold any Springs' products.[18] Ms. Rainsberry is similarly telling:

| |
|---|
| 20      Q.      Okay.  Are you familiar with a selling<br>21  event?<br>22      A.      Yes.<br>23      Q.      What is that?<br>24      A.      We grabbed a table and put some books on |
| Page 39<br> 1  it and stood around and were told to do your regular<br> 2  work, meaning if I had an initiative or an execution<br> 3  of blinds to install, I could do that so I wasn't<br> 4  wasting time just standing there in a Home Depot with<br> 5  nobody there or a Lowe's with nobody there. |

---

[14] Def's Mem. (ECF No. 86) at 11-12.

[15] *Id.* at 11.

[16] Poland Dep. (ECF No. 133) at 42:23-24.

[17] Grant Dep. (ECF No. 86-6) at 35:21-36:3.

[18] *Id.* at 164:10-12.

There is simply no selling involved here.[19] Plaintiff Nader put it even more bluntly. He explained that, as an FSR, he did not obtain commitments from customers to purchase Defendant's products at any time, let alone at these events.[20] Finally, Mr. Albertson explained that "[i]n-store sales events, we would do them on Saturdays and Sundays . . .  we'd set up a table, and kind of like a home garden show, people would walk by. If they wanted to ask questions, we're there to answer and stuff like that and talk about our product."[21]

The testimony from Plaintiffs Gettel-Barrett, Stovall, Hoover, Jackson, and Teitelbaum – the testimony Defendant claims "varied drastically" – further reinforces the fact that, as a collective, FSRs did not sell Defendant's products. Ms. Gettel-Barrett explained that these "selling" events "were a joke . . . because they were on Saturdays and basically we set up tables and, you know, just stood there basically."[22] She likewise explained that she never obtained a commitment from a customer to purchase a Springs Window Fashions product.[23] Plaintiff Stovall, like the others, testified that these events required the FSRs to be at "a table, a long table, a foldout Table . . . [and] set up our displays. Then we would usually walk around and do normally what we would do at a store location on a regular call or a regular visit,"[24] which involved manual labor

---

[19] Rainsberry Dep. (ECF No. 86-4) 38:20-39:5.

[20] (ECF No. 85-5) at 172:13-173:8; *see also id.* at 47:21-48:20 (. . . "FSR's don't have the capability to sell anything in the store.")

[21] Albertson Dep. (ECF No. 86-12) at 36:1-7; *see also id.* at 112:22-113:2 (if customers "bought products, a store associate was with me. If there was no one in there, all I was there to give product knowledge. I never sold anything. I couldn't sell anything.")

[22] Gettel-Barrett Dep. (ECF No. 107) at 58:1-6

[23] *Id.* at 156:12-15.

[24] Stovall Dep. (ECF No. 86-8) at 66:2-7

and was merchandising related.[25] Here is Ms. Hoover's take on these events:[26]

> Q.    I also want to talk about different
> 17   selling events.  Do you know what an in-store sales
> 18   event is?
> 19      A.    I know what it's supposed to be, yes.
> 20      Q.    And what is an in-store sales event?
> 21      A.    It used to be that we had to do them
> 22   Friday, Saturday, and Sunday.  Not every Friday,
> 23   Saturday, and Sunday, but those were the days that
> 24   counted as an in-store selling event.  And we
> Page 67
> 1   would -- should go and put up a table and create a
> 2   display and talk to that store's customers as they
> 3   came in if they have any questions.  That was the
> 4   intent.
> 5      Q.    If that was the intent, how did it work
> 6   in practice?
> 7      A.    In practice?  We would go to the store
> 8   on a Saturday, always in the fall they would do
> 9   these, and we would sit there; and we would look at
> 10   nothing, at no one, because no customers were
> 11   there.  Because it was football season.  And we
> 12   were lucky, in my case I should say, I was lucky if
> 13   there was even someone scheduled in the department
> 14   to help train.
> 15            So it was generally four hours of wasted
> 16   time that we had to do because that went on our
> 17   review.

She went on to explain that the FSR work – at these events not – simply does not involving selling Defendant's products.[27] Plaintiff Jackson's experiences are identical. She testified that "selling" events merely involved "putting up a table within the store promoting Bali or whatever product on a specific day. We weren't really, as I said, selling to the end-user. We were just setting up, you know, tables showing our products out there."[28] She likewise explained that FSRs "did not sell the

---

[25] *Id.* at 149:3-23. As discussed *infra* at 14-17, every Plaintiff testified that their primary duties involved manual labor and merchandising related tasks.

[26] Hoover Dep. (ECF No. 86-13) at 66:16-67:17.

[27] *Id.* at 110:14-22.

[28] Jackson Dep. (ECF No. 86-9) at 53:10-17.

product to the end-user."[29] Lastly, Plaintiff Teitelbaum's experiences were no different. He explained that these events required him to "set up a table, put [his] sample books on there . . . And we would have to do these events usually on the weekends for three hour time frames."[30] Like every other Plaintiff, he also explained that did not sell Defendant's products nor did not obtain commitments from customers to buy said products.[31]

This testimony is uniform. Plaintiffs were not engaged in sales, and these "selling events" do not qualify as exempt work. *See* 29 C.F.R. § 541.503(a) ("promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work."); 29 C.F.R. § 541.503(c) (a company representative who visits chain stores to arrange merchandise and consult with store managers, "but does not obtain a commitment for additional purchases" is non-exempt). That fact that some Plaintiffs may have attended more of these events than others simply does not matter. What matters is their collective testimony shows one thing: the work at these events does not qualify as exempt sales work. Plaintiffs thus share similar factual and employment settings because this testimony shows "'an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation'" of the FLSA. *Dennis v. Greatland Home Health Servs.*, No. 19-cv-5427, 2022 LEXIS 44466 *17 (N.D. Ill. March 14, 2022) (quoting *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012). Decertification is, thus, inappropriate. *See, e.g., Plewinski v. Luby's, Inc.*, No. H-07-3529, 2010 U.S. Dist. LEXIS 39179, at *16 (S.D. Tex. Apr. 21, 2010) (decertification was inappropriate because, *inter alia*, the plaintiffs were

---

[29] *Id.* at 26:25.

[30] Teitelbaum Dep. (ECF No. 86-11) at 38:19-39:1.

[31] *Id.* at 143:17-24.

similarly situated "with regard to their respective working conditions.")

        ii. *End users.*

Defendant next claims that "the testimony of Poland and the Opt-ins also varied widely on how often they interacted with end-customers outside of 'selling events.'"[32] In this section they cite the deposition testimony of Plaintiffs Jackson, Hoover, Grant, Askew, Rainsberry, and Teitelbaum in a failed attempt to create material differences where none exist. Yet, this testimony shows uniformity where it matters: regardless of the number of times they may interact with end-users, these interactions do not involve exempt sales work.

Let us begin with Ms. Jackson. She testified that she and other FSRs "personally did not sell the product to the end-user. [They] were basically just training people to sell."[33] To the extent she interacted with end-users, it involved "answering their questions that they might have about Springs's products."[34] This was typically done to help a store-associate.[35] Plaintiff Hoover's testimony is consistent with this. She testified that, on the occasions she actually did deal with end-consumers, it was *not* to sell but rather to *assist* a retail store-associate.[36] Ms. Grant's testimony also lines up with this. She explained that these interactions typically involved "people asking where the bathroom is, because we're [FSRs] doing our displays, and they're like where is the X,

---

[32] Def's Mem. (ECF No. 86) at 13. Defendant states Ms. Poland's name in this section but provides no citation or any discussion of her testimony on these matters.

[33] Jackson Dep. (ECF No. 86-9) at 26:24-27:2.

[34] *Id.* at 90:18-20.

[35] *Id.* at 92:10-13.

[36] Hoover Dep. (ECF No. 86-13) at 122:6-123:12.

Y, Z part" to which she would state "'I don't know. I'm just a vendor."[37] On the occasions when the conversations had more substance it was, like the others, in the context of assisting a retail store-associate.[38] Ms. Askew's experiences were similar. She testified that she, like other FSRs, was not obtaining commitments from end-users to purchases Defendant's products.[39]   She explained that

| |
|---|
| Q.     And part of your job duties, were you 24   responsible for obtaining commitments from customers |
| Page 99 1   to purchase Springs Window products? 2      A.   No.  I guess like I had said before, just 3   because you spoke to a customer about a particular 4   product doesn't mean that they're going to buy your 5   product because you can't stay in the store the whole 6   time to look over the customer to make sure that 7   they're doing whatever, you know what I mean? 8      Q.     So who would obtain that commitment to 9   purchase? 10     A.     It would be the associate. 11     Q.     And who is that associate?  Can you 12   specify for me? 13     A.     In the home -- the associate would be in 14   the home decor department.  They were called 15   specialists, or it would be a regular associate 16   because you had to have a -- they had an employee 17   number to get into their system. 18     Q.     And so you're referring to somebody that's 19   employed by like a Lowe's? 20     A.     Lowe's, Home Depot, JCPenney's, yes. |

As Ms. Askew's testimony here shows, these interactions with end-users are consistent in that they all demonstrates nonexempt work.  Ms. Rainsberry testified to a similar effect, despite working in

---

[37] Grant Dep. (ECF No. 86-6) at 166:8-15.

[38] *Id.* at 174:8-10 ("Very rarely. Maybe one or two occasions I spoke directly with the customer. Usually it's through the store associate.")

[39] Askew Dep. (ECF No. 86-14) at 98:23-99:20.

Page **- 11 -** of **26**

a different market.[40] She explained that 95 percent of her interactions with end-users were in the context of "working with the [retail-store] associate with the customer."[41] Like the others, she noted that she "never actually sold a product. There were other people selling the product, not [her] physically and not [her] working with a customer to gain [] sales. [Her] sales were reliant on another person" – the retail store associate.[42] Mr. Teitelbaum is the last FSR that Defendant references in this section. His testimony does not vary from the others. He explained that he never obtained commitments from end-users to buy Springs' products.[43] Like the others, he explained that interactions with end-users involved aiding retail-store associates.[44]

This "generally consistent testimony" militates against decertification. *See Harris v. Chipotle Mexican Grill, Inc.*, No. 13-cv-1719 (SRN/SER), 2017 U.S. Dist. LEXIS 90302, at *31 (D. Minn. June 12, 2017); *see also Brennan v. Qwest Communs. Int'l*, No. 07-2024 ADM/JSM, 2009 U.S. Dist. LEXIS 47898, at *16 (D. Minn. June 4, 2009) (deposition testimony demonstrating collectively similar factual and employment settings makes decertification inappropriate.)

       iii.   *Danielle Cases' email and testimony shows FSRs collectively are not engaged in exempt sales work.*

If Plaintiffs' deposition testimony is not enough to demonstrate their similar factual and employment settings then evidence from Danielle Case, Defendant's Senior Analyst of Retail Sales, surely tips the scale in favor of a collective trial. Ms. Case and others in Defendant's

---

[40] Ms. Askew worked as an FSR in Texas. *Id.* at 48:18-20.

[41] Rainsberry Dep. (ECF No. 86-4) at 177:10-16.

[42] *Id.* at 177:5-9.

[43] Teitelbaum (ECF No. 86-11) at 143:17-24

[44] *Id.* at 118:16-22.

corporate team would develop tasks for FSRs – every FSR in the nation – to complete.[45] In a few telling examples, Ms. Case and her colleagues developed a series of surveys for which all FSRs were responsible for having retail store associates complete.[46] When asked about these surveys, Ms. Case explained that retail-store associates are the "primary one[s] intersecting with the end users."[47] She then explained that these surveys involved sales related questions which FSRs *were never polled on*.[48] Moreover, Ms. Case explained that "sales" as applied to FSRs really means "the products that are sold at the stores and franchises that are assigned to a rep."[49]

The fact is that the Plaintiffs had the same experiences because the FSR position was "defined to be consistent job duties across all the territories."[50] As the evidence above shows, these are consistently not sales duties. Defendant's Motion should therefore be denied.

### c.  Application of the Administrative Exemption Militates Against Decertification.

Defendant next argues that there is a "wide variance" in the testimony of Plaintiffs in the context of the FLSA's "Administrative Exemption."[51] Employees are not entitled to overtime under this exemption when  they are (1) compensated on a salary or fee basis;  (2) have  primary duties involving office or non-manual work directly related to the management or general business

---

[45] Case Dep. (ECF No. 112) at 30:20-31:4

[46] *Id.* at 30:20-25.

[47] *Id.* at 39:25-40:3.

[48] *Id.* at 33:1-9; 40:23-41:7.

[49] *Id.* at 126:23-127:4.

[50] Owens Dep. (ECF No. 98) at 42:13-19.

[51] Def's Mem. (ECF No. 86) at 15-21.

operations of the employer or the employer's customers; and (3) whose primary duties includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. Defendant claims decertification is appropriate with respect to the testimony on prongs 2 and 3.[52] However, like the testimony on the Outside Sales exemption, the evidence demonstrates that Plaintiffs shared uniform experiences.

> i. *The Evidence Uniformly Demonstrates That Plaintiff and Collective Members Primarily Performed Physical Labor.*

Defendant cites the testimony of Plaintiffs Nader, Hoover, Teitelbaum, Miller, Grant, and Askew in its failed attempt to cast doubt on the uniformity of the manual work the Plaintiffs performed. On one hand, this is a misdirection: the term "primary job duty" typically means that "over 50 percent of the employee's time" but that is not a hard and fast rule. *Ingram v. Hagen*, 161 F. Supp. 3d 639, 646 (S.D. Ill. 2015) (citing *Kennedy v. Commw. Edison Co.*, 410 F.3d 365, 373 (7th Cir. 2005)). What matters most is the importance of the duty. 29 C.F.R. § 541.700. On the other hand, the depositions citied by Defendant actually *supports* a collective trial. They all explained that merchandising and daily display maintenance was their primary job.

To begin with, Mr. Nader testified that "it's the main job . . . daily display maintenance . . . check[ing] all the displays, mak[ing] sure they're functioning properly."[53] He explained that this is "very physical" work.[54] In the Fed. R. Civ. P. 30(b)(6) deposition, Defendant admitted that display integrity is an important part of every FSR's job.[55] Defendant went on to explain why the

---

[52] *Id.*

[53] Nader Dep. (ECF No. 86-5) at 170:24-171:5.

[54] *Id.* at 171:13-172:2.

[55] Owens Dep. (ECF No. 98) at 34:19-21,

FSRs' merchandising tasks are so critical: "that's really where the consumer on the retail side of the business is engaged. Point of impact with the visuals, the visual aids we've talked about."[56]

Plaintiff Hoover likewise stated that her job "was display maintenance."[57] Mr. Teitelbaum testified that Spring's motto of giving the "best experience" meant that "when a customer would come into the account, the store, [that Spring's had] displays that were functioning, [and] books that looked presentable."[58] He further testified that the FSRs' "primary job responsibilities were going in and to doing manual labor. So we were doing – we were setting displays. We were maintaining displays. We were maintaining machines. We had to switch out machines. We were completing resets."[59] Ms. Miller's experiences were the same. She stated that product displays played "[a] big role" in her job as an FSR, as they are responsible for "planograms and new samples or replacement samples" and "were responsible for making sure they were not only installed and displayed properly, in the right spot, the right signage, and kept neat and clean." Ms. Grant's testimony corroborates this. She testified that displaying cleaning and maintenance occurs on every store visit.[60] Finally, Plaintiff Askew's testimony is the same. She testified that FSRs are just glorified merchandisers, explaining that[61]

| |
|---|
| 22      A.    Because of all of the, I guess labor |
| 23   intensive things that we had to do.  We had to put |
| 24   signs up that were really tall, very tall.  You have |
| Page 98 |
| 1    to get an electric ladder to put them up like in |

---

[56] *Id.* at 158:6-14.

[57] Hoover Dep. (ECF No. 86-13) at 151:20.

[58] Teitelbaum Dep. (ECF No. 86-11) at 107:7-18.

[59] *Id.* at 137:15-21.

[60] Grant Dep. (ECF No. 86-6) at 164:13-24.

[61] Askew Dep. (ECF No. 86-14) at 97:22-98:12.

> 2   Lowe's, for instance.  And it was very off putting
> 3   because I hate heights.  I actually stopped doing that
> 4   because I just didn't feel it was safe for me.  And,
> 5   all of the changing of the displays.  Sometimes it
> 6   would take you 4, 6, 8, sometimes 10 hours to change
> 7   the displays because you had to take all the old
> 8   displays down.  You had to open up all the boxes, take
> 9   all the samples out, put them up, you know, and you're
> 10   doing this when the store is open and there are
> 11   customers walking around, associates walking around.
> 12   So, yeah.  It was pretty labor intensive

1.  <u>The FSR job description shows a universal requirement of manual labor</u>.

In addition to the uniform testimony provided by Plaintiffs, Defendant's own job descriptions confirm how physical the FSR job is. Manual labor is, quite literally, in the job description. Attached as Exhibit A are FSR job descriptions for every year in question. These were produced by Defendant. Each description mentions display integrity and/or physical requirements. This evidence, in addition to the above testimony, requires Defendant's Motion to be denied. *See Benton v. Deli Mgmt.*, 396 F. Supp. 3d 1261, 1285-86 (N.D. Ga. 2019) ("The existence of so many other commonalities . . . including job descriptions, duties, and pay provisions . . . as well as the central question of the reasonableness of Jason's Deli's current reimbursement—convince the Court that proceeding as a collective action is appropriate.").

2.  <u>Jim Gross' deposition testimony.</u>

There is yet more evidence in favor of a collective trial. The testimony of Jim Gross, Defendant's prior Vice President of Field Sales and Services,[62] is telling. His deposition is replete with testimony demonstrating that manual labor is a uniform requirement for FSRs.

---

[62] Gross Dep. (ECF No. 113) at 11:6-17.

For example, when asked why Spring's job descriptions contain a requirement that the FSR be able to lift anywhere from 1 to 15 pounds, Mr. Gross stated that[63]

| |
|---|
| is that a |
| 23 requirement for an FSR? |
| 24 A I think it's -- as I'd stated earlier, every |
| Page 57 |
| 1 time you go into a store, you know -- I say every time |
| 2 -- rare exception, just the nature of the business, |
| 3 there's going to be some display maintenance that's |
| 4 going to be done. Something as simple, again -- |
| 5 A -- a display blind is a pound. So if |
| 6 you're changing out a blind, for instance, at one |
| 7 store in a given day -- again, if you're visiting |
| 8 three to five stores a day, whatever it ends up being, |
| 9 chances are you're going to probably end up |
| 10 encountering some type of display maintenance. |

ii. *The Evidence Uniformly Demonstrates That Plaintiff and Collective Members' Primary Job Duties Did Not Exercise Discretion and Independent Judgment with Respect to Matters of Significance.*

Defendant then shifts gears and claims that "the testimony of Poland and the Opt-ins also varied widely on the extent to which they exercised discretion and independent judgement in performing their job duties."[64] It asserts that there are drastic variances in how the Plaintiffs (a) conducted trainings;[65] (b) would "build relationships" and;[66] (c) had "additional job duties" that demonstrate their discretion and independent judgment."[67]

Of course, the exercise of discretion and independent judgement only matters when it occurs on the context of the employee's *primary job duties*. 29 C.F.R. § 541.200. Here, as the evidence above shows, the FSRs' primary job duties were *not* office or non-manual work and,

---

[63] *Id.* at 67:24-57-10.

[64] Def's Mem. (ECF No. 86) at 16.

[65] *Id.* at 16-19.

[66] *Id.* at 19-20

[67] *Id.* at 20-21.

thus, there is no need for a trier of fact of analyze the third prong of the administrative exemption. Thus, these "additional duties" Defendant references are immaterial. Similarly, the "relationship building" Defendant references all occurs in the context of *non-exempt work.*

Plaintiffs' testimony is consistent where it matters: they all used Defendant's training materials in accordance with Defendant' instructions, rendering their job duties non-exempt. A collective trial is thus appropriate. *See Kudatsky v. Tyler Techs.*, No. C 19-07647 WHA, 2021 U.S. Dist. LEXIS 35565, at *21 (N.D. Cal. Feb. 25, 2021) (emphasis added) ("Despite variation in phase, client, or supervision, [defendant's] written policies, agendas, *training materials*, sample data sets, and testimony of leadership, will speak uniformly to the administrative exemption analysis.").

1. Plaintiffs all used Defendant's training materials in a uniform fashion and without discretion.

Defendant cites the deposition testimony of Plaintiffs Poland, Teitelbaum, Gettel-Barrett, Grant, Wheeler, and Nader in its misguided claim that the "testimony varied drastically in the manner" they trained retail-store associates.  Of course, Springs omitted crucial testimony in this section.

For example, Ms. Poland explained that she used Defendant's training materials in interactions with retail-store associates training materials and made no substantive changes.[68] Plaintiff Teitelbaum testified to the same effect.[69] Ms. Gettel-Barrett likewise stated that the contents, *the substance*, of all trainings came from Springs.[70] Plaintiff Grant testified that the

---

[68] Poland Dep. (ECF No. 86-2) at 37:13-38:4.

[69] Teitelbaum Dep. (ECF No. 86-11) at 37:7-21.

[70] Gettel-Barrett Dep. (ECF No.86-7) 161:20-162:4.

contents of any "trainings" are pre-packaged and are never substantively changed.[71] Plaintiff Wheeler likewise explained that "[i]t was pretty spot on that we [FSRs] were following what guides we were given."[72] Finally, Mr. Nader explained he and other FSRs would hand out "hard copy features and benefits pages" created by Springs.[73] Again – there are no substantive variances here.

In fact, Jim Gross' deposition confirms that Springs uniformly expected FSRs to use these materials – and without deviation. This passage is particularly telling:[74]

> Q Does Spring Windows provide any training
> 4 materials to field sales representatives?
> 5 A Yes.
> 6 Q My first question is, what are those
> 7 materials?
> 8 A I couldn't give you an exhaustive list but
> 9 give you some examples. You know, whether it's small
> 10 flier handouts for kind of the little mini talking
> 11 points, PowerPoint presentation material, marketing
> 12 pieces, could even use sales books, for instance, at
> 13 the store -- use the back of the sales book. There's
> 14 a lot of content there that you can actually train off
> 15 of, so it's things of that nature.
> 16 Q Are FSRs expected to use those talking
> 17 points?
> 18 A Yes.

2. <u>Plaintiffs all used Defendant's plan-o-grams in a uniform fashion and without discretion.</u>

Much like the training materials, the Plaintiffs all testified that they were required to strictly follow Defendant's plan-o-grams. A plan-o-gram "identifies where each of the sample blinds go

---

[71] Grant Dep. (ECF No. 86-6) at 30:2-31:2; 169:7-170:1.

[72] Wheeler Dep. (ECF No. 86-10) at 145:18-19.

[73] Nader Dep. (ECF No. 86-5) at 18:12-13

[74] Gross Dep. (ECF No. 113) at 102:3-18.

on a display . . . The planogram indicates where sample blinds are placed on that display."[75] The Plaintiffs were responsible for maintaining these. And they had to do so without discretion.[76] These plan-o-grams, along with display maintenance, were, in fact, *their most important duty*. As Ms. Case explained: "displays and planograms are ultimately that consumer's first point of contact with the options they may purchase, so it is important that those displays and those sample blinds are in good condition as that *is what leads to the consumer helping them to make that final purchase* and be interested in blinds and shades."[77] Most importantly for present purposes, *this is class-wide requirement*. As Jim Gross testified: "part of the job responsibilities is to maintain those displays to the planogram."[78]

There simply were no substantive differences in any of the Plaintiffs' experiences. Their collective testimony has shown that they spent their time performing the *same* non-exempt tasks in the *same* fashion. Any differences Defendant has pointed out simply *do not matter*. "Rare would be the collective action - or class action for that matter - where the employees labored under the exact same circumstances. Indeed, '[i]f one zooms in close enough on anything, differences will abound[.]'" *Thompson v. Bruister & Assocs.*, 967 F. Supp. 2d 1204, 1220 (M.D. Tenn. 2013)

---

[75] Case Dep. (ECF No. 112) at 86:20-23.

[76] *Id.* at 118:14-20 (explaining the need for consistency in displays); *see also* Rainsberry Dep. (ECF No. 86-4) at 34:6-20 ("Okay. When you were setting up these displays, did you ever have any creativity? · Were you allowed to –A.  No. Q. -- vary the displays? A. No Q. No? A. There was a planogram. Q.  There was a planogram. Okay.  And those were created by who? A. Springs. Q. Did you ever make any suggestions to Springs on how to modify a planogram if you noticed that one wasn't working?  A.· No"); Stovall Dep. (ECF No. 86-8) at 58:9-59:1 (same).
[77]Case Dep. (ECF No. 112) at 118:1-7 (emphasis added).

[78] Gross Dep. (ECF No. 113) at 55:23-54:6.

(quoting *Frank v. Gold 'n Plump Poultry, Inc.,* 2007 U.S. Dist. LEXIS 71179, 2007 WL 2780504 at *4 (D. Minn. Sept. 24, 2007)). This action is not vulnerable to decertification.

      d.   <u>A Collective Trial is Feasible.</u>

Ms. Poland and the Opt-ins are similarly situated. Not only that, this case can be feasibly tried as a collective action. Defendant attempts to cast shade on this fact by citing to Seventh Circuits' *Espenscheid* decision. 705 F.3d at 773-74.[79] However, there are material distinctions between this case and the facts present in *Espenscheid.*

*Espenscheid* involved a class of over *two-thousand and three hundred* plaintiffs. *Id.* at 773. The plaintiffs there proposed representative testimony of just 42 of the 2,341 Plaintiffs – in other words, *merely 1.79 percent of the class.* Crucially, class counsel in *Espenscheid* did not "explain[] in his briefs, and was unable to explain to [the Court] at the oral argument though pressed repeatedly, how these 'representatives' were chosen—whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and handpicked to magnify the damages sought by the class." *Id.* at 774.

Here, the testifying, representative plaintiffs were chosen based on the geographic territory they covered. In other words, the individuals were chosen based solely on where they worked for Defendant. The individuals include: Michelle Poland, Jim Nader; Janel Grant; Kristen Gettel-Barrett; Cynthia McClintock; Sheryl Hoover; Marissa Wheeler; and Diana Rainsberry.[80] This allows the trier of fact to see that, no matter where or when a FSR works for Defendant, their experiences are essentially uniform.

---

[79] Def's Mem. (ECF No. 86) at 22.

[80] (ECF No. 86-17).

Defendant's FSRs operate within certain geographic regions. In the United States, these are the Midwest Region, the North Central Region, the Northeast Region, the Southeast Region, the Southwest Region, and the West Region.[81] Here, the representative Plaintiffs were chosen based solely on the respective region where they worked. Named Plaintiff Poland worked for Springs in the Midwest Region, specifically the areas of west Tennessee, North Mississippi and east Arkansas.[82] Jim Nader was an FSR in the North Central Region.[83] Janel Grant works as an FSR in the Northeast Region.[84] Plaintiff Gettel-Barrett worked in the West Region, primarily in San Diego, California, but also in parts of Arizona[85] Ms. McClintock also worked in the Northeast Region but, unlike Ms. Grant, was based out of and worked in the Virginia area.[86] Ms. Hoover's also worked Midwest Region but unlike Ms. Poland, her territory was in Iowa and Platteville, Wisconsin.[87] Plaintiff Marissa Wheeler was in the Northeast Region, but covered a different geographic territory. Mr. Wheeler's area of concern involved Toledo, Ohio, parts of Michigan, and parts of Indiana.[88] Mr. Albertson was an FSR in the West Region and covered Utah, southern

---

[81] Case Dep. (ECF No. 112) at 43:8-20. Ms. Case is Defendant's Senior Analyst of Retail Sales. *Id.* at 9:18-19.

[82] Poland Dep. (ECF No. 86-2) at 61:24-62:4.

[83] *See* Nader Dep. (ECF No. 86-5) at 156:8-9.

[84] Grant Dep.  (ECF No. 86-6) at 25:12-18.

[85] *See* Gettel-Barrett Dep. (ECF No. 86-7) at 47:11-21.

[86] McClintock Dep. (ECF No. 86-3) at 42:21-23.

[87] *See* Hoover Dep. (ECF No. 86-13) at 54:1-3.

[88] Wheeler Dep. (ECF No. 86-10) at 119:6-13.

Idaho, parts of Wyoming, parts of Colorado, parts of Nevada, Guam, Hawaii, and for one year Alaska.[89] Finally, Plaintiff Rainsberry covered southern California.[90]

These individuals comprise *23.52 percent* of the total collective action. This is far above what many courts find to be adequate for sampling purposes. *Ross v. Jack Rabbit Servs., LLC*, Civil Action No. 3:14-cv-00044-DJH, 2015 U.S. Dist. LEXIS 45603, at *10 (W.D. Ky. Apr. 7, 2015) (ordering representative discovery of a 10% sample) and far above what was proposed in *Espenscheid*. The representative Plaintiffs will testify to about their near identical experiences from different Springs' regions. From coast to coast, this testimony can "establish a factual nexus sufficient to proceed as a collective action." *Allen v. City of Chi.*, No. 10 C 3183, 2014 U.S. Dist. LEXIS 150308, at *19-20 (N.D. Ill. Oct. 22, 2014). Not only that, *but every Plaintiff* has completed written discovery which can be used at trial.[91]

If the above was not enough to allow this matter to procced collectively, then Defendant's own admissions certainly are. The evidence in this case is replete with testimony explaining the uniformity of FSRs' experiences. Defendant cannot now claim these experiences are so different such that a collective trial is impractical.

Take the Defendant's Fed. R. Civ. P. 30(b)(6) deposition testimony, for example. Springs produced Mr. Kent Owens as its representative for the Rule 30(b)(6) deposition. Mr. Owens is Defendant's current Senior Vice President and General Manager of Retail and Internet.[92] Mr.

---

[89] Albertson Dep. (ECF No. 86-12) at 44:8-15.

[90] Rainsberry Dep. (ECF No. 86-4) at 38:12-16.

[91] Defendant served both Requests for Production and Interrogatories on every Opt-in. Each Plaintiff currently in this matter has fully responded to said written discovery.

[92] Owens Dep. (ECF No. 98) at 26:10-13 (emphasis added).

Owens explained that Defendant's "field sales reps are national workforce. They have their own defined regions territories, but it's *designed to be wholistic in that regard . . . defined to be consistent job duties across all the territories*."[93] In other words, FSR's job duties *are uniform by design*. Likewise, Joe Tate, Defendant's Northeast regional sales manager,[94] explained that, no matter where an FSR is, "[t]he job expectation is identical, whether this is in Scott's territory or in another territory. A Home Depot customer is the same."[95] Don Kelley, another regional sales manager,[96] explained that all FSRs are assessed and judged on the same criteria.[97] It does not stop there; Elsa Sanchez, the regional sales manager for the Central Region,[98] also confirmed that FSRs are assessed and judged on the same criteria.[99]

Defendant's cries that this matter cannot be tried collectively are made in vain.

      e.   <u>If This Action is Decertified then Equitable Tolling is Necessary.</u>

Finally, if this Court is inclined to decertify this matter, the claims of the Opt-in Plaintiffs should be equitably tolled for a period of thirty (30) days. The FLSA's statute of limitations is subject to equitable tolling." *Davis v. Kohler Co.*, No. 2:15-cv-01263, 2017 WL 3865656, at *7 (W.D. Tenn. Aug. 30, 2017). "[D]elays during the collective-action certification process constitute

---

[93] *Id.* at 42:13-19.

[94] Tate Dep. (ECF No. 92) at 10:15-17.

[95] *Id.* at 39:8-11.

[96] Kelley Dep. (ECF No. 100) at 10:11-11:19. Mr. Kelly has been a regional sales manager in the West Region (subsequently broken into the South Central and Southwest) and Southeast Region. *Id.*

[97] *Id.* at 23:5-9.

[98] Sanchez Dep., attached as Exhibit B, at 10:14.

[99] *Id.* at 18:24-19:2.

'extraordinary circumstances' beyond plaintiffs' control, making them appropriate for the application of equitable tolling." *Kutzback v. LMS Intellibound*, LLC, 233 F. Supp. 3d 623, 631 (W.D. Tenn. 2017). "In order to avoid prejudice to opt-in plaintiffs, Courts may invoke equity powers to toll the statute of limitations in FLSA collective actions that have been decertified." *Scott v. Chipotle Mexican Grill*, No. 12-CV-8333 (ALC)(SN), 2017 U.S. Dist. LEXIS 59753, at *28-29 (S.D.N.Y. Apr. 18, 2017) (citing *Cruz v. Dollar Tree Stores, Inc.*, No. 07-cv-2050 (SC), 2011 U.S. Dist. LEXIS 24860, 2011 WL 843956, at *8 (N.D. Cal. Mar. 8, 2011)).

Equitable tolling here allows the Opt-in Plaintiffs to file individual matters before their claims expire. Most Opt-in Plaintiffs here are former employees. If their claims are dismissed without tolling, much, if not all, of their statute of limitations will be eroded. Decertification, therefore, will effectively be an adjudication on the merits in favor of Defendant. Thus, if the Court is inclined to grant Defendant's Motion, the claims of the Opt-ins should be equitably tolled for a period of thirty (30) days.

## III.    CONCLUSION

As the evidence shows, this matter is best suited for a collective trial. The Plaintiffs – indeed, every FSR – all performed the *same* non-exempt job duties in the *same* fashion. Decertification has no utility here. *See Lassen v. Hoyt Livery, Inc.*, No. 13-cv-1529 (VAB), 2016 U.S. Dist. LEXIS 169506, at *43 (D. Conn. Dec. 8, 2016) ("Decertification of a FLSA collective action is therefore inappropriate where, as here, plaintiffs' claims center on common issues of law or fact regarding defendants' uniform practices and policies.") "And to the extent that the question presents a close call, concerns for the purposes of the FLSA as a remedial statute tip the balance decidedly against decertification." *Harris*, 2017 U.S. Dist. LEXIS 90302, at *43. Defendant's Motion should therefore be denied.

Date: June 2, 2022                    Respectfully Submitted,

                                      */s/Robert E. Morelli, III*
                                      J. Russ Bryant (TN BPR #033830)
                                      Robert E. Turner, IV (TN BPR #35364)
                                      Robert E. Morelli, III (TN BPR #037004)
                                      **JACKSON, SHIELDS, YEISER, HOLT,**
                                      **OWEN & BRYANT**
                                      Attorneys at Law
                                      262 German Oak Drive
                                      Memphis, Tennessee 38018
                                      Tel: (901) 754-8001
                                      Fax: (901) 759-1745
                                      rbryant@jsyc.com
                                      rturner@jsyc.com
                                      rmorelli@jsyc.com

                                      ***Attorneys for Plaintiff and others similarly***
                                      ***situated***

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

This, the 2nd day of June, 2022.

                                      */s/Robert E. Morelli, III*