**IN THE UNITED STATES DISTRICT COURT FOR
FOR THE WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION**

| | |
|---|---|
| MICHELE POLAND, individually and on behalf of herself and others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>SPRINGS WINDOW FASHIONS, LLC, a Delaware Limited Liability Company,<br><br>     Defendant. | Case No. 3:21-cv-00165-jdp<br><br>Chief Judge James D. Peterson<br>Magistrate Judge Stephen L. Crocker |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS FOR
SUMMARY JUDGMENT AS TO OPT-IN PLAINTIFF SUSAN MILLER**

Rather than seeking summary judgement on a collective basis, Defendant has filed piecemeal motions. In one of them, it seeks summary judgment on the claims of Opt-in Plaintiff Susan Miller ("Plaintiff" or "Miller").[1] Defendant Springs Window Fashions, LLC ("Defendant or "Springs") claims that it is entitled to summary judgment because, as a Field Sales Representative ("FSR"), Ms. Miller's primary job duties exempt her from the Fair Labor Standards Act's ("FLSA") overtime provisions. Specifically, Springs argues that Miller's primary job duties qualify her as either as an exempt outside-sales person[2] or for the FLSA's Administrative Exemption.[3]

---

[1] (ECF No. 122).

[2] Def's Mem. in Support of Motion for Summary Judgment as to Opt-in Plaintiff Susan Miller (ECF No. 122), hereinafter "Def's Mem." at 2.

[3] *Id.*

Defendant's Motion fails because there are genuine issues of disputed fact as to what exactly Miller's primary job duties were. Plaintiff maintains that her primary job duties involved manual labor and center around various merchandising related tasks. *See infra* at 5-12. This is a dispute that a fact-finder must resolve. *See, e.g., Geist v. Handke*, No. 17-cv-2317-JWL, 2018 U.S. Dist. LEXIS 120637, at *8 (D. Kan. July 19, 2018) (internal citation omitted) (emphasis added) (". . . the primary duty analysis is a factual one . . . *Summary judgment is proper, then, only if there is no genuine dispute regarding plaintiff's primary duties*. Here, the record reflects numerous factual disputes about both the nature and scope of plaintiff's duties as well as which of plaintiff's duties are primary."); *Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*, No. 17-8817, 2019 U.S. Dist. LEXIS 225191, at *15 (E.D. La. Nov. 26, 2019) ("Essentially, the 'primary duty' element requires the fact-finder to analyze the facts to determine the employee's primary job duty and how that work directly relates to certain parts of the employer's business.")

This core dispute requires denial of Defendant's motion. If her primary duties involved manual labor and merchandising, then her primary job duties cannot be said to have been administrative or sales. However, there are other material factual disputes that preclude summary judgment: Plaintiff maintains that she did not engage in sales, much less as her primary duty. There are also disputed issues of material fact pertaining to the required exercise of discretion and independent judgment necessary for the Administrative Exemption. *See infra* at 12-20.

For these reasons, discussed more fully below, Defendant's Motion should be denied.

## A.  STANDARD OF REVIEW

Summary judgment is proper only when "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). The Court must

"construe all facts and reasonable inferences in favor of" the non-moving party. *Phelan v. Cook Cty.*, 463 F.3d 773, 778 (7th Cir. 2006) (citing *Telemark Dev. Group, Inc. v. Mengelt*, 313 F.3d 972, 976 (7th Cir. 2002)). If there is a genuine dispute of fact as to the nature and scope of an employee's primary duty, summary judgment must be denied. *Tamas v. Family Video Movie Club, Inc.*, No. 11 C 1024, 2013 U.S. Dist. LEXIS 44313, at *10 (N.D. Ill. Mar. 28, 2013).

## B.  FACTS

Defendant manufactures and distributes home furnishing products such as window blinds, shades, panels and drapery hardware throughout the United States.[4] These are then sold the "big-box" retailers (Home Depot, Lowe's, J.C. Penney's, Menards)[5] as well as in Budget Blind franchises. Springs employs FSRs to service these accounts.[6]

Miller's job duties as an FSR were extremely labor intensive.[7] She was "[r]esponsible for the integrity of displays" and was required to "regularly install new displays and update existing displays with new products or new hardware as required, clean/tidy displays as necessary and update pricing and sample books."[8] Miller testified that product displays comprised a "major" role of the job as an FSR.[9] She was often provided "initiatives" she was required to complete. These

---

[4] Def's Answer to First Am. Compl. (ECF No. 28) at ¶ 2.

[5] Owens Dep. (ECF No. 98) at 44:19-23.

[6] FSR Job Descriptions (ECF No. 146-1); Miller Dep. (ECF No. 124) at 41:23-42:2.

[7] Miller Dep. (ECF No. 124) at 152:6-14 (testifying to types of manual labor expected of her); 152:15-17 ("Q. So would you say it was kind of a labor-intensive position? A. Yes."); 162:16-19 ("Always labor intensive."); 154:3-18 (testifying to using pallet jack to move products around and generally the physical aspect of setting up display).

[8] FSR Job Descriptions (ECF No. 146-1) at 2, 5, 8, 11, 14.

[9] Miller Dep. (ECF No. 124) at 55:14-19.

are "tasks that [FSRs are] given to do by Springs. Generally, they're new displays that need to be hung at the different retail stores. Sometimes it's promotion signs that we have to verify have been hung, but they're jobs."[10] These job duties are very physically demanding.[11] Displays are assembled and maintained pursuant to "plan-o-grams."[12] Plan-o-grams are what "identifies where each of the sample blinds go on a display.[13] The display itself, right, is what's built. The planogram indicates where sample blinds are placed on that display."[14]

As an FSR, Miller also did "resets" which involved both complete resets of entire display walls and "minor" resets of parts of display walls; all of which involved a resetting of displays via manual labor.[15] She was also responsible for point of purchase ("POP") materials. These are, for example,

> behind the blinds if you had a display blind, you'd open up the blind and there would be a card there describing what the product is, dimensions, pricing, those type of things. So point of purchase is just the signage we put on there. Could be a call-out, something's new, 'Hey, look, here's a new feature.' So it's anything that's really kind of around what is displayed in the store that's a sales aid marketing.[16]

---

[10] Gross Dep. (ECF No. 113) at 35:9-13.

[11] Miller Dep. (ECF No. 124) at 152:15-17.

[12] *Id.* at 153:2-20; 162:16-24.

[13] Miller Dep. (ECF No. 124) at 6-8 ("Q. Did you ever get a chance to be creative when setting up displays? A. No. They gave it to us and we put it up.").

[14] Case Dep. (ECF No. 112) at 86:20-23.

[15] Miller Dep. (ECF No. 124) at 162:16-21.

[16] Gross Dep. (ECF No. 113) at 70:7-71:5. This is also referred to as the "point of impact." Owens Dep. (ECF No. 98) at 158:10.

The above are just "some really good examples" of what POP encompasses.[17] Miller, like all FSRs, was also required to make sure the POP was in perfect condition on every store visit.[18] Cleaning and otherwise maintaining displays is what she did on a day-to-day basis.[19]

### C. ARGUMENT

There are is a material factual dispute over what exactly Miller's primary job duties involved. Plaintiff maintains that her job duties involved manual labor and merchandizing related tasks. Defendant claims those job duties involved sales or administrative work. Summary judgment is thus improper as this is a "genuine dispute of fact as to the nature and scope of an employee's primary duty." *Tamas*, 2013 U.S. Dist. LEXIS 44313 at *10.  Setting this aside, Defendant's Motion also fail because it is premised on a flawed definition of "making sales" as well as a misapplication of the Administrative Exemption's "exercise discretion and independent judgment" requirement."

a. There are Disputed Issues of Material Fact as to the Very Nature of Miller's Primary Duty.

As noted above, there is a fundamental dispute as to the nature of Miller's primary job duties. A reasonable fact-finder can determine that it involved manual labor. This is neither sales nor administrative work. Summary judgment is thus improper.

---

[17] Gross Dep. (ECF No. 113) at 70:22.

[18] *Id.* at 72:1-13.

[19] Miller Dep. (ECF No. 124) at 51:14-16 ("Which made mine [displays] looks better because I took good care of them.");152:3-17.

"Determination of an employee's primary duty must be based on all the facts in a particular case . . . " 29 C.F.R § 541.700(a). Relevant factors[20] include, but are not limited to: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* The term "primary job duty" typically means is done "over 50 percent of the employee's time." *Ingram v. Hagen*, 161 F. Supp. 3d 639, 646 (S.D. Ill. 2015*)* (citing *Kennedy v. Commw. Edison Co.*, 410 F.3d 365, 373 (7th Cir. 2005)).

> i. *The relative importance of the exempt duties as compared with other types of duties.*

This first factor is "determined from the viewpoint of the employer." *Ely v. Dolgencorp, LLC*, 827 F. Supp. 2d 872, 886 (E.D. Ark. 2011). "[N]umerous courts have found 'this intensive fact-based inquiry is inappropriate for summary judgment.'" *Tamas,* 2013 U.S. Dist. LEXIS 44313, at *13 (quoting *Ely*, 827 F. Supp. 2d at 887). This factor shows that Miller's field *service*, maintenance, and merchandising job duties were the most important duties she had as an FSR.

Defendant's corporate representatives and managers have, time and time again, expressed the importance of this non-exempt work. For example, Kent Owens, Defendant's Senior Vice President and General Manager of Retail and Internet (and Fed. R. Civ. P. 30(b)(6) designee),[21]

---

[20] Defendant's Motion contains no discussion of these factors. It simply states what it believes Miller's primary duties are and provides no justification for *why* any particular duty is a primary one. This also requires denial of the Motion. *See Adkins v. Mid-American Growers*, 965 F. Supp. 1076, 1081 (N.D. Ill. 1997) (citing *Mitchell v. Kentucky Fin. Co.*, 359 U.S. 290, 291 (1959)) ("It is undisputed that an employer who claims an exemption under the FLSA has the burden of proving its applicability.")

[21] Owens Dep. (ECF No. 98) at 26:10-13.

explained that "in-store merchandising" is "really where the consumer. . . *that's really where the consumer on the retail side of the business is engaged*. Point of impact with the visuals, the visual aids we've talked about. The store associate giving them confidence in their purchase decision or here's the right choice for you."[22] Jim Gross, Defendant's previous Vice President of Field Sales and Service,[23] likewise explained that "each time you go in a store, there is a light servicing of merchandise, a pretty brutal environment when you think about retail. I hate to say it, but. *So yeah, it's important*."[24] He further testified that "that merchandise displayed well, right, from a consumer perspective. It's a good sales aid."[25] Mr. Gross then explained that Springs' spends "multi-million dollars of investment" in displays and POP, thus it is important for FSRs to maintain them.[26] Donald Kelley, Defendant's South Central and South West Regional Sales Manager[27] and Miller's direct manager,[28] agreed that the appearance of products is a critical factor in whether or not Springs is successful in any given retail store.[29] He then explained that displays were vital to Springs because "consumers are still very visual, and the reason they still go into brick and mortar,

---

[22] *Id.* at 158:3-14 (emphasis added).

[23] Gross Dep. (ECF No. 113) at 11:15-17.

[24] *Id.* at 52:2-5 (emphasis added).

[25] *Id.* at 36:13-15.

[26] *Id.* at 36:16-37:15.

[27] Kelley Dep. (ECF No. 100) at 10:11-20.

[28] Miller Dep. (ECF No. 124) at 129:2.

[29] Kelley Dep. (ECF No. 100) at 85:6-13; Gross Dep. (ECF No. 113) at 66:14-17 ("Is there a correlation between good displays and good merchandising and - and sales? Short answer is yes.")

and into retain [sic] accounts specifically is so they can see, touch and feel, so yeah they are important in that aspect."[30]

It does not end there. Each year Springs host an "International Sales Meeting" ("ISM").[31] The ISM is an annual training event all FSRs are expected to attended.[32] Defendant covers topics it considers important at the ISMs.[33] For example, in the 2020 ISM Springs ranked "transform instore merchanting" as its number one "retail strategic imperative."[34] Springs hammered the importance of "showroom integrity" and making sure displays are in "**perfect**" condition.[35] The importance of in-store merchandising is stressed each year at the ISM, not just in 2020, In 2018, Springs had an entire PowerPoint presentation entitled "Tips, Tricks & Troubleshooting Field Repairs."[36] This presentation provides a feel for some of the labor Miller was required to perofrm as an FSR. And this labor was very important to Springs.  Danielle Case, Defendant's Senior Analyst of Retail Sales,[37] put it this way[38]

> Q. Okay. And what role do displays play in
> 21 the jobs that FSR's do?
> 22 A. So --
> 23 Q. The job duties that FSR's do.

---

[30] *Id.* at 63:15-21

[31] Owens Dep. (ECF No. 98) at 19:11-18.

[32] *Id.*

[33] Gross Dep. (ECF No. 113) at 19:1-4.

[34] (ECF No. 159) at Def's Bates No. Springs Window (Poland)000648-706.

[35] *Id.* at 000653 (emphasis in original); *see also id.* at Bates No. 649, 652, 662.

[36] Def's Bates No. Springs Window (Poland)002084-002105, attached as *Exhibit A*.

[37] Case Dep. (ECF No. 112) at 9:18-19.

[38] *Id.* at 121:20-122:25.

24 A. Okay. So displays are an important part
25 as it is the way that a consumer and store

122

1 associates understand what that product is. They
2 can touch and feel it. They can see what options
3 are available. For example, what kind of lift
4 systems. They can see the colors, right, the
5 fabrics. They can touch and feel. And so sample
6 blinds and displays are very important as the
7 consumer does need to be able to touch and feel in
8 order to make that final decision on purchase --
9 making their purchase. And so it is important that,
10 you know, those sample blinds are up-to-date as that
11 is what can attract a consumer over to that
12 department as well as helping them make that final
13 decision.
14 They're also a great training tool for new
15 store associates, et cetera. So understanding what
16 type of display and what that planogram is in a
17 store is very important for us just to make sure
18 it's a crossway to communicate back and forth
19 between what the store tells us, what the merchants
20 may tell us versus what's really out there because
21 the reps are on that frontline, right, and truly
22 know what it is. And so ensuring that those
23 displays are up-to-date and looking in great
24 condition really is important and is a part of the
25 entire selling process.

Ms. Case also explained that when displays are good condition, sales increase, and when they are in bad condition, sales suffer.[39]

The evidence thus shows that *Defendant* considered merchanting and display maintenance the most important thing Miller did as an FSR. Thus, a jury can reasonably conclude that these non-exempt tasks were her primary job duties. A material factual dispute as to the very nature of Miller's primary job duties exists. This Motion should be denied. *See Sydney v. Time Warner Entm't-Advance/Newhouse P'ship*, 751 F. App'x 90, 94 (2nd Cir. 2018) ("the evidence, construed in Plaintiffs' favor, does not support a conclusion that Plaintiffs' sales duties were more important than their installation duties. Of course, growing their customer base and convincing existing customers to purchase additional services is undoubtedly paramount to [sales]; however, their

---

[39] *Id.* at 87:21-24.

installation duties were also consequential,"); *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp. 2d 273, 277 (W.D.N.Y. 2007) (denying summary judgment because while "there are facts which could lead to [] a conclusion" the plaintiff's job duties were exempt, "there are other facts that indicate the contrary.")

### ii. The amount of time spent performing exempt work.

This factor also precludes summary judgement. The amount of time spent performing exempt work is a question of fact. *Brunner v. Liautaud*, No. 14-C-5509, 2015 U.S. Dist. LEXIS 46018, at *27 (N.D. Ill. Apr. 8, 2015); *Reich v. Avoca Motel Corp.*, 82 F.3d 238, 240 (8th Cir. 1996). Miller, as an FSR, spent most of her time in retail stores whom sell Springs' products. Her CRM[40] entries also confirm that most of her time was spent on merchandising and display maintenance.[41] This is, of course, consistent with the testimony of other FSRs. For example, Plaintiff Nader testified that display maintenance was "[d]aily and "the main job."[42] Plaintiff Rainsberry explained that she

> wore jeans and a tennis shoe to work every day. It was a huge part of my job. Manual [labor]. When you have to get up on a 12-foot ladder and do a signage display with another rep because it was two-person job, pull all the graphics up and then install shutters and shutters boxes on that display, it was a manual display. I was forever getting cut and bruised.[43]

---

[40] CRM is a CRM stands for Customer Relationship Management. CRM is a software system Grant and other FSRs are required to use. Case Dep. (ECF No. 112) at 76:16-17.

[41] *See, e.g., Exhibit B* to Plaintiff's Resp. to Def's Proposed Findings of Fact (ECF No. 165-2). These entries have been edited to remove confidential information at Defendant's request, such as store contacts and store numbers.

[42] Nader Dep (ECF No. 86-5) at 170:22-24.

[43] Rainsberry Dep. (ECF No. 149) at 187:14-21.

It is not just the Plaintiffs' testimony that shows this factor cuts in Miller's favor. Mr. Gross' testimony also supports Plaintiff's position that she spent most of her time on non-exempt manual labor. He explained that FSRs, like Miller, have display maintenance *every* store visit.[44] Defendant's job descriptions also support Miller's position here. Those job descriptions state that "[FSRs] are required to lift stock, sample books, and display parts weighing from 1-15 pounds *frequently during a typical workday*."[45] They further explain that FSRs, like Miller, are "[r]esponsible for the integrity of displays. He/she will *regularly* install new displays and update existing displays with new products or new hardware as required, clean/tidy displays as necessary and update pricing and sample books."[46] Likewise, "[t]here is *often* a need to climb stepladders and work from moderate heights while installing and maintaining displays."[47]

### iii.    The employee's relative freedom from direct supervision.

The evidence on this factor militates in favor of Miller. Miller's manager routinely reviewed her CRM entries and held meetings to discuss her duties. More critically, Defendant's CRM system operates panoptically. Panoptic surveillance can be understood as a state of constant monitoring. *See* Michel Foucault, 1980. *Power/Knowledge: Selected Interviews and Other Writings* (New York: Pantheon 1972-1977). In other words, every action is supervised, and every event recorded.

---

[44] Gross Dep. (ECF No. 113) at 56:24-57:15.

[45] FSR Job Descriptions (ECF No. 146-1) at 3, 7, 10, 13, 16, 18, 22 (emphasis added).

[46] *Id.* at 2, 5, 8, 11, 14, 20 (emphasis added)

[47] *Id.* at 3, 7, 10, 13, 16, 18, 22 (emphasis added)

It is undisputed that CRM is "a tool for FSR's to be able to enter in their activities and track their activities on a day-to-day basis."[48] Not only that, Miller was expected to record her work in CRM daily.[49] Defendant trains its FSRs to "[u]pdate [a]ccount [a]ctivity immediately after call is finished."[50] Miller's manager also reviews these entries and told her what to do based on them.[51] Thus, CRM is way for Defendant's way to micromanage Miller and all FSRs.[52]

> iv.  *The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.*

The evidence for both side is admittedly lacking on this factor. Plaintiff's annual salary as of 2019 was $67,619.50.[53] This equates to $24.77 per hour when broken down to an hourly rate.[54] According to the United States Bureau of Labor Statistics, this is less per hour than the average hourly-rate of pay in almost *every industry* in May of 2021. *See Table B-3. Average hourly and weekly earnings of all employees on private nonfarm payrolls by industry sector, seasonally adjusted*, available at https://www.bls.gov/news.release/empsit.t19.htm (last visited June 11,

---

[48] Case Dep. (ECF No. 112) at 76:21-23; Miller Dep. (ECF No. 124) at 141:3-24 – 142:1-4.

[49] *Id.* at 110:14-17; Miller Dep. (ECF No. 124) at 8-9 ("With them tracking every moment of my day, wanting CRM to bs used.").

[50] Def's Bates No. Springs Window (Poland)03347989, attached as *Exhibit B*. This is an excerpt from Defendant's CRM training guide.

[51] Miller Dep. (ECF No. 124) at 140:19-142:4.

[52] Miller Dep. (ECF No. 124) at 141:3-10; 141:11-14 ("Q. Did you feel it was the CRM that was micromanaging? A. No, it was the managers that were doing the micromanaging, that was just the tool they used."); *see also* Case Dep. (ECF No. 112) at 90:24-25.

[53] Miller Dep. (ECF No. 124) at 27:17-20.

[54] This equation assumes 52.5 hours per week, ($67,619.50/52weeks per year =$1,300.38 per week; $1,300.38 /52.5 hours = $24.77).

2022). Nonetheless, "in the absence of all relevant evidence, summary judgment on the issue of whether the Plaintiffs are exempt employees would be improper." *Durham v. Lake Cty.*, No. 2:13-CV-300-JEM, 2022 U.S. Dist. LEXIS 47543, at *29 (N.D. Ind. Mar. 17, 2022).

b.  <u>Defendant Misapprehends the Definition of "Making Sales."</u>

Defendant claims the "undisputed facts establish that Miller's primary job duty was engaging in sales of Springs' products" within the meaning of the Outside Sales Exemption.[55] On the one hand, this is completely conclusory: they provide *zero analysis* of the factors relevant in determining what an employee's primary duty is. It simply states it is sales without support.  As noted above, there is a dispute as to what Miller's primary duty actually was. On the other hand, Defendant's position rests on a flawed understanding of the pertinent regulation and the corresponding case law.

The Outside Sales Exemption is met where the employee's primary duty is making sales. "Sales" is defined under the FLSA to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k); *see also* 29 C.F.R § 541.501 (sales includes "the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property.")

Defendant cites *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) to support its claim that Miller was *functionally* making sales.[56] It asserts that the post-*Christopher* test for making sales is "whether the employees *obtain some commitment* from customers to purchase the

---

[55] Def's Mem. (ECF No. 122) at 4.

[56] *Id.* at 4-6. It also claims she "directly" made sales to end-users. This is utter subterfuge. *See generally* Plaintiff's Resp. to Def's Proposed Findings of Fact (ECF No. 165).

product."[57] However, the *Christopher* decision does not provide the support Defendant thinks it does.

*Christopher* involved pharmaceutical sales representatives who claimed that they were misclassified as exempt from the FLSA's overtime provisions. *Id.* at 147 Their job duties involved obtaining a nonbinding commitment from physicians to prescribe respondent's products. *Id.* at 151. The employer claimed the pharmaceutical sales representatives were exempt outside sales persons, and the Supreme Court agreed. *Id.* at 169.

However, the Court's ruling was controlled by the unique regulatory environment in which the pharmaceutical sales industry sits. The Court explained that

> obtaining a nonbinding commitment from a physician to prescribe one of respondent's drugs is the most that petitioners were able to do to ensure the eventual disposition of the products that respondent sells. *This kind of arrangement, in the unique regulatory environment within which pharmaceutical companies must operate*, comfortably falls within the catch-all category of 'other disposition.'

*Id.* at 165 (emphasis added). The Court then elaborated that

> Our point is not, as the dissent suggests, that any employee who does the most that he or she is able to do in a particular position to ensure the eventual sale of a product should qualify as an exempt outside salesman. Rather, *our point is that, when an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities*.

*Id.* at 567 U.S.165 n.23 (emphasis added) (internal citations omitted).

This case *does not* "involve an entire industry [that] is constrained by law or regulation from selling its products in the ordinary manner." It involves a windows' covering company who sells its products in a retail environment.[58] There is simply no regulatory regime preventing an

---

[57] *Id.* at 5 (emphasis added).

[58] *See* Owens Dep. (ECF No. 98) at 40:2-6.

FSR, like Miller, from making a sale. What prevented her from being a salesperson *is Defendant's business model*. Mr. Owens was asked to explain what a typical transaction looks like for the purchaser of Defendant's products in the retail store context.[59] He explained that

> [t]heres typically some pre-research. The consumer, end user might have done some homework and tried to get facts online . . . And then they will come into a Lowe's or a Depot store, let's say, to get a better look at the product and understand it. They really need the concert of someone to properly guide them through it because it's still quite complicated . . . So really that's where the assistance of a store associate comes in and helps in the selling process. They're like, hey, here's the benefits if you're looking at your den . . . *And by the way, keep in mind the store associate is doing this* . . . In any case, you get to the consumer. Here's the products you like, here's the fabrics you like, here's the lift system you like, motorized or just cordless or corded. And then you've kind of gotten all that buttoned up . . . And then when that order is placed, let's say through Depot, after having done all that work, the whole process could take honestly 45 minutes. It's a fairly consultive sale.[60]

He then explained that the retail store collects the payment.[61] Note how Miller – the FSR – is entirely absent in this scenario.

Miller's duties as an FSR simply did not involve making sales – even under the test Defendant advocates for.[62] As noted above, Defendant claims the "analysis turns upon whether the

---

[59] *Id.* at 160:24-161:1.

[60] *Id.* at 161:7-163:23 (emphasis added).

[61] *Id.* at 164:17-18.

[62] Miller Dep. (ECF No. 124) at 44:11-14 ("My experience as a field sales rep remained the same. It was training and merchandising and making sure that you promoted our products to the store associates."); 155:5-7 ("Q. And so do you feel that as a field sales rep that you were actually making sales to customers? A. No.").

employees obtain some commitment from customers to purchase the product they are selling."[63] However, there is no evidence that Miller *obtained any commitment* from customers to purchase Spring's products.[64]

Miller explained that she had only some direct interactions with end-users, but that those interactions never resulted in the ultimate selling of a Springs' product.[65] She explained that there were many occasions when she would speak to an end-user about a Springs product only to have that end-user turn around and purchase a competitor's product.[66] Miller would also deal with end-users it was at "selling events," albeit on rare occasions. These were events "where [FSRs would] set up a table with brochures and some hand samples and some sample books. . .."[67] Critically, at no point in these events is she obtaining any commitment regarding the purchase of Spring's products.[68] In fact, Miller testified that due to the low interest from end-users at these selling events, she found them to be a "waste of time."[69]

---

[63] Def's Mem. (ECF No. 88) at 5.

[64] Miller Dep. (ECF No. 124) at 148:8-11 (testifying that she never got a commitment from any consumer to purchase a Springs product).

[65] *Id.*; *Id.* at 155:5-20.

[66] Miller Dep. (ECF No. 124) at 148:8-11 ("Q. But that doesn't mean that they [end user] were actually committing to going through and purchasing a Springs product? A. Correct."); 155:15-20

[67] Deposition of Janel Grant (ECF No. 91) at 35:21-36:2.

[68] Miller Dep. (ECF No. 124) at 69:15-18 ("Oftentimes I stood there with my candy bowl and my sample books and my samples and people just weren't interested. And occasionally, if there was someone, I would turn them over to the store associate.").

[69] Miller Dep. (ECF No. 124) at 69:12-13.

Defendant then claims that the "post-*Christopher* case that bears most directly on the application of the outside sales exemption to the work Miller performs" is the First Circuit's decision in *Modeski v. Summit Retail Sols., Inc.*, 27 F.4th 53, 55-56 (1st Cir. 2022). That case involved "Brand Representatives" for a marketing company. *Id.* at 54. The First Circuit concluded they qualified as outside salespeople. *Id.*

The employees in *Modeski* conceded "that their 'primary duty' was communicating with potential customers and trying to convince them to buy the featured products (and not, for example, stocking shelves or setting up the displays)." *Modeski*, 27 F.4th at 56. This is not a concession Miller makes. At any rate, the Brand Representatives "work[ed] to persuade shoppers, who then can demonstrate some intention (or 'nonbinding commitment') to buy a product by placing it in their shopping carts or baskets." *Id.* at 27 F.4th 57. Even under *Modeski*, her marginal non-merchandising duties cannot qualify as sales.

### c. Defendant Misstates the Outside Sales Exemption's Discretion and Independent Judgment Requirement.

Defendant then states that if Miller's primary duty was not making sales, then it was properly characterized as exempt administrative work.[70] Employees will fall under the Administrative Exemption when (1) they are compensated on a salary basis; (2) their primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) those primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R § 541.200. Critically, the exercise of discretion and independent judgment *only matters* if it is performed in the context of the employee's *primary job duty*. *Id.*

---

[70] Def's Mem. (ECF No. 88) at 5.

This is where Springs yet again jumps the gun. As explained above, there is a very real dispute over what the primary duty is. A reasonable fact finder can conclude that Miller's primary duty was in fact the performance of *manual work*. This requires denial of Defendant's motion. *See Smith v. Schwan's Home Serv.*, No. 2:13-cv-00231-JAW, 2014 U.S. Dist. LEXIS 165883, at *92 (D. Me. Nov. 25, 2014); *Buntin v. Schlumberger Tech. Corp.*, No. 3:16-cv-00073-TMB, 2018 U.S. Dist. LEXIS 227961, at *18 (D. Alaska Aug. 6, 2018).

However, for argument's sake, even if Miller's primary duty was work directly related to the management or business operations of Springs,[71] there are disputed issues of material fact as to whether that duty "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2)-(3). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

Here Miller merely followed Springs' well-established techniques and procedures.[72] The Seventh Circuit's decision in *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1055 (7th Cir. 2020) and the Sixth Circuit's decision in *Perry v. Randstad Gen. Partner (US) LLC*, 876 F.3d 191 (6th Cir. 2017) and help illustrate this point.

*Bigger* was a FLSA misclassification case involving individuals Facebook employed as "Client Solutions Managers," or "CSMs." 947 F.3d at 1047. The CSM position had two functions: "one focusing on 'analytical work' (looking at data to make advertising recommendations), and

---

[71] To reiterate, this is not a concession Miller makes.

[72] Miller Dep. (ECF No. 124) at 64:15-23; 151:20-24 – 152:1-2.

the other focusing on 'upselling' (increasing advertisement sales to existing clients)." *Id.*
Facebook claimed Bigger "was expected to perform duties 'with a significant amount of autonomy
and independence'" while Bigger claimed "she merely took direction from clients and her
supervisor, and implemented prescribed steps from manuals, scripts, and templates." *Id.* at 1055.
The lower court denied Facebook's motion for summary judgment on the Administrative
Exemption, and the Seventh Circuit affirmed. *Id.* at 1055-56. The Seventh Circuit noted that

> Bigger explained that she essentially relayed information and followed outlined
> instructions or troubleshooting guides. She further explained that her recommendations to
> clients were based on reports generated by Facebook's analytical tools after she plugged
> data into them; and her recommendations were either transmitted from other Facebook
> teams or had to be reviewed and accepted by her manager and client partner. With this
> evidence in the record, and viewing all facts in the light most favorable to Bigger, we
> cannot conclude that, as a matter of law, Bigger customarily and regularly did more than
> apply well-established techniques, procedures, or specific standards prescribed by
> Facebook.

*Id.*

The workers in *Perry* worked for a staffing agency. They had various titles throughout their
employment, but their job duties "generally included marketing and selling Randstad's services."
*Id.* at 194. The Sixth Circuit reversed the lower court's summary judgment order on the
Administrative Exemption. *Id.* at 210-212. The court explained that

> [i]t appears that most of a Staffing Consultant's sales responsibilities involved little more
> than 'use of skill in applying well-established techniques, procedures or specific standards'
> prescribed by Randstad. As related to sales, the record evidence does not establish that
> Staffing Consultants had 'authority to formulate, affect, interpret, or implement
> management policies or operating practices,' and, accepting Plaintiffs' testimony as true,
> Staffing Consultants had little or no ability to 'waive or deviate from established policies
> and procedures without prior approval.' Nor is there evidence they 'carrie[d] out major
> assignments' or 'perform[ed] work that affect[ed] business operations to a substantial
> degree.'

*Id.* at 210 (internal citations omitted).

The facts of this case are in line with *Bigger* and *Perry*.  Springs provides FSRs like Miller with materials they are required to use to discuss product's features and benefits.[73] Some of these materials include "small flier handouts for kind of the little mini talking points, PowerPoint presentation material, marketing pieces, could even use sales books, for instance, at the store – use the back of the sales book. There's a lot of content there that you can actually train off of, so it's things of that nature."[74] Some key examples of these materials are filed as *Exhibit A* to Plaintiff's Resp. to Def's Proposed Findings of Fact (ECF No. 165-1).

Miller testified that the substance of trainings came straight from Defendant's materials.[75] She explained that Springs provided PowerPoints and other materials that were already put together to assist FSRs conduct training.[76] It is indisputable she is expected to follow these materials.[77] Indeed, Defendant admitted that the content of these materials is <u>not</u> to change.[78] At the end of the day, the training is all a canned message coming straight from the Defendant.[79]

---

[73] Gross Dep. (ECF No. 112) at 102:3-18; Miller Dep. (ECF No. 124) at 37: 9-11 ("I would use the information they [Springs] gave us on it [products] and train the associates with that as well. . ..).

[74] *Id.* at 102:8-15.

[75] Miller Dep. (ECF No. 124) at 49:7-9; 151:20-23.

[76] Miller Dep. (ECF No. 124) at 64:15-23.

[77] Gross Dep. (ECF No. 113) at 102:16-18 ("Q. Are FSRs expected to use those talking points? A. Yes.").

[78] Owens Dep. (ECF No. 98) at 97:10-13; Miller Dep. (ECF No. 124) at 49:7-9.

[79] *Id.* at 95:11-98:2.

Defendant relies heavily[80] on the Seventh Circuit's *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560 (7th Cir. 2012) decision. However, that case presented a set of drastically different facts. The plaintiff there was a self-described "scientist." 679 F.3d at 581 n.16. There, the plaintiff explained she was "charged with 'convey[ing] scientific information to physicians about how and why [Lilly's] product is beneficial to patients.'" *Id.* The sales representatives there would also develop "a pre-call plan," which could include reviewing the physician's prescribing practices, patient population, and similar information, to develop a strategy for a conversation with the physician that would induce the physician to prescribe the employer's pharmaceutical products. *Id.* at 563-64.

Here, like in *Perry*, Miller's "discretion" "was much more circumscribed; in contrast to the representatives in *Schaefer-LaRose*". Miller was "merely following" Springs' "well-established techniques and procedures." *Perry*, 876 F.3d at 211. To the extent she did any "planning" it did not involve discretion. As Mr. Owen's explained, the FSR simply reviews the data and it shows exactly what is go to be a Tier 1 and Tier 2 and so on.[81] "Moreover, unlike the representatives in *Schaefer-LaRose*, [Miller's] task was . . . not to 'convey scientific information' while navigating 'federal law and . . . medical ethics requirements' in a 'tightly regulated industry." *Id.* at 211-212 (quoting at *Schaefer-LaRose*, 679 F.3d at 562-63, 568 n.16). Like in *Bigger*, too, Miller "essentially relayed information and followed outlined instructions or [] guides." *Bigger*, 947 F.3d at 1055. Thus, summary judgement is inappropriate. When viewing all facts in the light most favorable to Miller, it cannot be said "that, as a matter of law, [she] customarily and regularly did

---

[80] Def's Mem. (ECF No. 122) at 13-20.

[81] Owens Dep. (ECF No. 98) at 261:10-13.

more than apply well-established techniques, procedures, or specific standards prescribed by [Springs]. *Id.* at 1056.

### D.  CONCLUSION

Defendant's Motion should be denied due to one simple fact: there is material factual dispute as to what exactly Miller's primary duty was. *See Tamas*, 2013 U.S. Dist. LEXIS 44313, at *10. The Court can end the analysis there. There is no need for the Court to consider what is and is not a "sale," nor is there a need to wade through the elements of the Administrative Exemption. Nonetheless, there are material factual disputes over whether Miller *ever* made *any* sale as an FSR. There are likewise material factual disputes regarding the "discretion and independent judgment" prong of the Administrative Exemption. For these reasons, summary judgment is inappropriate. A jury must decide these disputes.

Case: 3:21-cv-00165-jdp    Document #: 166    Filed: 06/24/22    Page 23 of 23

Date: June 24, 2022                          Respectfully Submitted

                                             */s/ Robert E. Turner, IV*
                                             J. Russ Bryant (TN BPR #033830)
                                             Robert E. Turner, IV (TN BPR #35364)
                                             Robert E. Morelli, III (TN BPR #037004)
                                             **JACKSON, SHIELDS, YEISER, HOLT,
                                             OWEN & BRYANT**
                                             Attorneys at Law
                                             262 German Oak Drive
                                             Memphis, Tennessee 38018
                                             Tel: (901) 754-8001
                                             Fax: (901) 759-1745
                                             rbryant@jsyc.com
                                             rturner@jsyc.com
                                             rmorelli@jsyc.com

                                             ***Attorneys for Plaintiff and others similarly
                                             situated***


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

                                             */s/Robert E. Turner, IV*

23